UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BARBARA WOLFSON, Derivatively on Behalf of ZOETIS INC., <br><br> Plaintiff, <br><br> v. <br><br> KRISTIN C. PECK, WETTENY JOSEPH, PAUL M. BISARO, VANESSA BROADHURST, FRANK A. D'AMELIO, GAVIN D.K. HATTERSLEY, SANJAY KHOSLA, ANTOINETTE R. LEATHERBERRY, MICHAEL B. McCALLISTER, GREGORY NORDEN, WILLIE M. REED, MARK STETTER, LOUISE M. PARENT, ROBERT W. SCULLY, and STEPHANIE TILENIUS, <br><br> Defendants, <br><br> -and- <br><br> ZOETIS INC., <br><br> Nominal Defendant. | Civil Action No. _____ <br><br><br> **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** <br><br><br> **JURY TRIAL DEMANDED** |

Plaintiff Barbara Wolfson ("Plaintiff"), by the undersigned attorneys, brings this stockholder derivative action for the benefit of nominal defendant Zoetis Inc. ("Zoetis" or the "Company") against its Chief Executive Officer ("CEO"), Chief Financial Officer ("CFO") and current and former members of the Zoetis Board of Directors (the "Board" collectively with the CEO and CFO, the "Individual Defendants") for their breaches of fiduciary duties and violations of the federal securities laws. Plaintiff alleges the following based upon personal knowledge as to

- 1 -

Plaintiff's own acts, and upon information and belief, which includes, but is not limited to, investigation and analysis by Plaintiff's counsel, including, among other things, a review of the Company's press releases and public filings with the United States Securities and Exchange Commission ("SEC"), corporate governance documents published on the Company's website, a review of the securities fraud class action complaint filed against the Company and certain of its current and former officers and directors, *City of Ann Arbor Retiree Health Care Benefit Plan & Trust v. Zoetis Inc., et al.*, Case No. 1:26-cv-04401-JGK (S.D.N.Y.) (the "Securities Class Action"), transcripts of the Company's conference calls with financial analysts and investors, published news reports, and other publicly available information about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations after a reasonable opportunity for discovery.

## I.      NATURE OF THE ACTION

1.      Zoetis, an animal health company spun off from Pfizer Inc. ("Pfizer") in 2013, develops, manufactures, and sells medicines, vaccines, diagnostics, and other products for companion animals and livestock. This action arises from the Individual Defendants' failure to implement and maintain an effective system of internal controls to oversee Zoetis' critical Companion Animal business, in the face of mounting product safety concerns affecting the Company's flagship products and the emergence of direct, lower-priced competition from a leading animal health rival, and to ensure that the Company's public statements concerning its business were truthful. The Companion Animal business generates approximately 70% of the Company's revenue. Pursuant to their fiduciary obligations and obligations under the Company's governance policies and procedures, the Individual Defendants were responsible for overseeing

that business and the material risks to it, including product safety, regulatory developments, and the competitive position of the Company's leading franchises. They failed to do so.

2. In December 2024, the U.S. Food and Drug Administration ("FDA") issued a "Dear Veterinarian Letter" alerting veterinarians to adverse events, including ataxia, seizures, other neurological signs, urinary incontinence, and, in some cases, death, that had been reported in dogs receiving the Company's flagship osteoarthritis pain product, Librela. Librela was one of the Company's most important Companion Animal products, and the FDA's findings bore directly on its safety profile and on veterinarians' willingness to prescribe it. The product safety concerns identified by the FDA fell squarely within the oversight responsibilities of the Board's Quality and Innovation Committee, which is charged with overseeing the Company's programs relating to manufacturing quality and environmental, health and safety matters. The Individual Defendants failed to oversee the Company's response to those findings and to ensure that the Company addressed the safety profile of, and the erosion of veterinarian confidence in, Librela.

3. At roughly the same time, Elanco Animal Health Incorporated ("Elanco"), a leading competitor in animal health, introduced products aimed squarely at two of the Company's most important Companion Animal franchises. Elanco's Zenrelia entered the canine dermatology market against the Company's Apoquel, promoted as matching or exceeding Apoquel's performance while carrying a lower price, and its Credelio Quattro entered the canine parasiticide market against the Company's Simparica Trio at a lower price and with broader parasite coverage. Elanco's entry into these markets directly threatened the growth, pricing, and market share of franchises that drove the Company's results. However, again the Individual Defendants failed to oversee the Company's competitive response and to ensure that the Company candidly addressed the threat to its leading Companion Animal franchises.

4.      Compounding their failures of oversight, the Individual Defendants caused or allowed Zoetis to issue materially false and misleading statements that downplayed and concealed the deterioration of the Company's Companion Animal business — even as the Company's quarterly results forced the Company and its directors and officers to disclose successive declines in flagship products, slowing growth, intensifying competition, increasing pet-owner price sensitivity, and successive reductions to the Company's financial guidance.

5.      On August 5, 2025, even as Defendant CEO Kristin C. Peck ("Peck") assured investors that Zoetis' key franchises had significant runway for "durable growth," Defendant CFO Wetteny Joseph ("Joseph") was forced to disclose that U.S. sales of osteoarthritis-pain monoclonal antibodies had declined 12% in the second quarter and that the U.S. ramp-up of Librela had "not gone according to expectations." On November 4, 2025, even as Defendant Peck assured investors that the Company's growth engine remained "resilient," Defendant Joseph was forced to disclose that global osteoarthritis-pain monoclonal-antibody sales had declined 11% operationally, that U.S. sales of Librela had fallen 26%, that Key Dermatology growth had slowed to 3% operationally from 11% the prior quarter, and that the Company had suffered share loss in U.S. dermatology — and Defendant Peck cut the Company's full-year 2025 revenue growth guidance. On February 12, 2026, even as Defendant Peck insisted that Zoetis was "competing from a position of strength," Defendant Joseph was forced to disclose that U.S. osteoarthritis-pain monoclonal-antibody sales had declined 25% in the fourth quarter and that U.S. sales of Librela had fallen 32% — and Defendant Peck slashed the Company's 2026 growth outlook to 3% to 5%, well below Zoetis' historical mid-to-high-single-digit trajectory.

6.      While the Company's stock was artificially inflated by the misrepresentations and omissions alleged herein, certain of the Individual Defendants sold 21,210 shares, reaping proceeds of more than $2.7 million.

7.      In addition, while the Company's stock was artificially inflated, the Individual Defendants caused or permitted Zoetis to repurchase over 28.9 million shares of its own common stock for approximately $3.8 billion, overpaying by approximately $1.3 billion when measured against the post-disclosure closing price of $87.31 per share on May 7, 2026.

8.      Finally, on May 7, 2026, the Company was forced to disclose that its U.S. segment revenue declined 8% and that U.S. Companion Animal sales declined 11% — concessions reflecting "an increasingly competitive landscape" and "heightened competitive pressure" across the Company's flagship dermatology and parasiticide franchises.

9.      Further, just twelve weeks after projecting 3% to 5% organic operational revenue growth for 2026, the Company cut its 2026 guidance range to 2% to 5% organic operational revenue growth and reduced the Company's 2026 adjusted diluted earnings per share guidance. Following these disclosures, the Company's stock plummeted by more than 21%, wiping out approximately $10 billion in market capitalization in a single trading day.

10.     On May 27, 2026, the Securities Class Action was filed in the United States District Court for the Southern District of New York against the Company, Defendant Peck, and Defendant Joseph, asserting claims under Sections 10(b) and 20(a) of the Exchange Act on behalf of all persons and entities that purchased or otherwise acquired Zoetis securities between January 14, 2025 and May 6, 2026, inclusive. As a result, the Company will incur substantial costs defending itself and its officers in the Securities Class Action and faces further substantial costs in the event of an adverse judgment.

11.     Plaintiff did not make a demand on the Board to institute this action because, as set forth below, such a demand would be futile. The Individual Defendants are neither disinterested nor independent. Absent this action, Zoetis will neither recover its damages nor properly remediate the weaknesses in its internal controls and corporate governance practices and procedures.

## II.     JURISDICTION AND VENUE

12.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 10(b) and 14(a) of the Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78n(a), and SEC Rules 10b-5 and 14a-9 (17 C.F.R. § 240.14a-9) promulgated thereunder, and for contribution pursuant to Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f)(5),(8). This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

13.     This Court has jurisdiction over each Defendant named herein because each Defendant has sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. This action is not a collusive one to confer jurisdiction on a court of the United States that it would not otherwise have.

14.     Venue is proper in this District pursuant to Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), because Defendants have conducted business in this District, a substantial portion of the acts and omissions alleged herein, including the dissemination of materially false and misleading information, occurred in this District, Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District, and the Securities Class Action is pending in this District.

## III.    THE PARTIES

### A.    Plaintiff

15.    Plaintiff Barbara Wolfson has been a stockholder of Zoetis since February 1, 2013 and has held shares of Zoetis common stock continuously since that time. As such, Plaintiff was a stockholder at the time of the transactions complained of herein. Plaintiff will adequately and fairly represent the interests of Zoetis in enforcing and prosecuting its rights and, to that end, has retained competent counsel, experienced in derivative litigation, to prosecute this action.

### B.    Nominal Defendant

16.    Nominal Defendant Zoetis Inc. is a Delaware corporation with its principal executive offices at 10 Sylvan Way, Parsippany, New Jersey 07054. Zoetis' common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "ZTS." Zoetis is named solely as a nominal party in this action.

### C.    Officer Defendants

17.    Defendant Peck has served as the CEO of Zoetis since January 2020 and as a director since October 2019. Peck served at Pfizer from February 2004 to October 2012, including as Executive Vice President, Worldwide Business Development and Innovation, from December 2010. In October 2012, Peck became Zoetis' Executive Vice President and Group President, U.S. Operations, Business Development and Strategy, in connection with the Company's spin-off from Pfizer. Since fiscal year 2024, Peck has received the following compensation from Zoetis:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive | All Other | Total |
|---|---|---|---|---|---|---|
| 2024 | $1,300,000 | $9,562,347 | $3,187,500 | $2,730,000 | $426,913 | $17,206,760 |
| 2025 | $1,350,045 | $10,218,583 | $3,406,229 | $2,187,000 | $1,884,697 | $19,046,509 |

18.     Defendant Joseph has served as Executive Vice President and CFO of Zoetis since June 2021. Joseph is a named defendant in the Securities Class Action. Since fiscal year 2024, Joseph has received the following compensation from Zoetis:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive | All Other | Total |
|---|---|---|---|---|---|---|
| 2024 | $750,000 | $2,390,440 | $796,875 | $997,500 | $154,646 | $5,089,461 |
| 2025 | $800,000 | $2,849,611 | $949,961 | $832,000 | $164,941 | $5,596,513 |

### D.     Director Defendants

19.     Defendant Paul M. Bisaro ("Bisaro") has served as a Zoetis director since May 2015. Bisaro is a member of the Corporate Governance Committee[1] and the Quality and Innovation Committee. Since fiscal year 2024, Bisaro has received the following compensation from Zoetis:

| Year | Fees Earned | Stock Awards | Total |
|---|---|---|---|
| 2024 | $100,000 | $240,000 | $340,000 |
| 2025 | $100,000 | $250,000 | $350,000 |

20.     Defendant Vanessa Broadhurst ("Broadhurst") has served as a Zoetis director since July 2022. Broadhurst is a member of the Corporate Governance Committee and the Quality and Innovation Committee. Since fiscal year 2024, Broadhurst has received the following compensation from Zoetis:

| Year | Fees Earned | Stock Awards | All Other | Total |
|---|---|---|---|---|
| 2024 | $100,000 | $240,000 | $500 | $340,500 |
| 2025 | $100,000 | $250,000 | $5,000 | $355,000 |

21.     Defendant Frank A. D'Amelio ("D'Amelio") has served as a Zoetis director since July 2012. From 2010 to 2022, D'Amelio served in various senior executive roles at Pfizer.

---

[1] The Company changed the name of the Corporate Governance and Sustainability Committee to the Corporate Governance Committee. This Committee is referred to as the Corporate Governance Committee throughout this complaint.

D'Amelio serves as the chair of the Human Resources Committee and is a member of the Audit Committee. Since fiscal year 2024, D'Amelio has received the following compensation from Zoetis:

| Year | Fees Earned | Stock Awards | All Other | Total |
|---|---|---|---|---|
| 2024 | $112,500 | $240,000 | $5,000 | $357,500 |
| 2025 | $125,000 | $250,000 | — | $375,000 |

22.    Defendant Gavin D.K. Hattersley ("Hattersley") has served as a Zoetis director since April 2024. Hattersley serves as the Chair of the Corporate Governance Committee and is a member of the Audit Committee. Since fiscal year 2024, Hattersley has received the following compensation from Zoetis:

| Year | Fees Earned | Stock Awards | Total |
|---|---|---|---|
| 2024 | $75,000 | $240,000 | $315,000 |
| 2025 | $106,250 | $250,000 | $356,250 |

23.    Defendant Sanjay Khosla ("Khosla") has served as a Zoetis director since June 2013. Khosla is a member of the Human Resources Committee and the Quality and Innovation Committee. Since fiscal year 2024, Khosla has received the following compensation from Zoetis:

| Year | Fees Earned | Stock Awards | Total |
|---|---|---|---|
| 2024 | $100,000 | $240,000 | $340,000 |
| 2025 | $100,000 | $250,000 | $350,000 |

24.    Defendant Antoinette R. Leatherberry ("Leatherberry") has served as a Zoetis director since December 2020. Leatherberry is a member of the Human Resources Committee and the Audit Committee. Since fiscal year 2024, Leatherberry has received the following compensation from Zoetis:

| Year | Fees Earned | Stock Awards | All Other | Total |
|---|---|---|---|---|
| 2024 | $100,000 | $240,000 | — | $340,000 |
| 2025 | $100,000 | $250,000 | $5,000 | $355,000 |

25.    Defendant Michael B. McCallister ("McCallister") has served as a Zoetis director since January 2013, and as the Board Chair since June 2013. Since fiscal year 2024, McCallister has received the following compensation from Zoetis:

| Year | Fees Earned | Stock Awards | Total |
|---|---|---|---|
| 2024 | $250,000 | $240,000 | $490,000 |
| 2025 | $250,000 | $250,000 | $500,000 |

26.    Defendant Gregory Norden ("Norden") has served as a Zoetis director since January 2013. Norden is the chair of the Audit Committee and a member of the Corporate Governance Committee. Since fiscal year 2024, Norden has received the following compensation from Zoetis:

| Year | Fees Earned | Stock Awards | Total |
|---|---|---|---|
| 2024 | $125,000 | $240,000 | $365,000 |
| 2025 | $125,000 | $250,000 | $375,000 |

27.    Defendant Willie M. Reed ("Reed") has served as a Zoetis director since March 2014. Reed is the Chair of the Quality and Innovation Committee and a member of the Corporate Governance Committee. Since fiscal year 2024, Reed has received the following compensation from Zoetis:

| Year | Fees Earned | Stock Awards | All Other | Total |
|---|---|---|---|---|
| 2024 | $125,000 | $240,000 | $5,000 | $370,000 |
| 2025 | $125,000 | $250,000 | —— | $375,000 |

28.    Defendant Mark Stetter ("Stetter") has served as a Zoetis director since May 2025. Stetter is a member of the Human Resources Committee and the Quality and Innovation Committee. In fiscal year 2025, Stetter received the following compensation from Zoetis:

| Year | Fees Earned | Stock Awards | Total |
|---|---|---|---|
| 2025 | $66,667 | $250,000 | $316,667 |

29.　Defendant Louise M. Parent ("Parent") served as a Zoetis director from August 2013 to May 2026. During that period, Parent served on the Audit Committee, the Human Resources Committee, and the Corporate Governance Committee, including as Chair of the Corporate Governance Committee. Since fiscal year 2024, Parent has received the following compensation from Zoetis:

| Year | Fees Earned | Stock Awards | All Other | Total |
|------|-------------|--------------|-----------|-------|
| 2024 | $125,000 | $240,000 | $5,000 | $370,000 |
| 2025 | $118,750 | $250,000 | $5,000 | $373,750 |

30.　Defendant Robert W. Scully ("Scully") served as a Zoetis director from June 2013 to May 2025. Scully served on the Audit Committee and as the Chair of the Human Resources Committee. Since fiscal year 2024, Scully has received the following compensation from Zoetis:

| Year | Fees Earned | Stock Awards | Total |
|------|-------------|--------------|-------|
| 2024 | $112,500 | $240,000 | $352,500 |
| 2025 | $50,000 | $250,000 | $300,000 |

31.　Defendant Stephanie Tilenius ("Tilenius") has served as a Zoetis director since December 2025. Tilenius is a member of the Human Resources Committee and the Audit Committee. In fiscal year 2025, Tilenius received the following compensation from Zoetis:

| Year | Fees Earned | Stock Awards | Total |
|------|-------------|--------------|-------|
| 2025 | $8,333 | $250,000 | $258,333 |

32.　Defendants Peck, Joseph, Bisaro, Broadhurst, D'Amelio, Hattersley, Khosla, Leatherberry, McCallister, Norden, Reed, Stetter, Parent, Scully, and Tilenius are referred to collectively herein as the "Individual Defendants."

## IV.　THE INDIVIDUAL DEFENDANTS' DUTIES

33.　By reason of their positions as officers and directors of Zoetis, each of the Individual Defendants owed and owes Zoetis and its stockholders fiduciary obligations of loyalty,

good faith, due care, and candor, and was and is required to use their utmost ability to control, manage, and oversee the business and affairs of the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Zoetis and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit.

34.    Each director and officer of the Company owes a fiduciary duty to Zoetis and its stockholders to exercise good faith and diligence in the administration of the affairs of the Company, including establishing and maintaining adequate financial controls and accurately and truthfully reporting the Company's financial condition and compliance with applicable laws.

35.    To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.

36.    As senior executive officers and directors of a publicly traded company whose common stock was registered with the SEC and traded on the NYSE, the Individual Defendants also owed a duty to ensure the dissemination of accurate, complete, and truthful information concerning Zoetis' financial condition, operations, products, internal controls, and business prospects. In addition, the Individual Defendants had a duty to cause the Company to disclose in its regulatory filings with the SEC all material facts so that the market price of the Company's shares would be based upon accurate information. In order to meet these duties, the Individual Defendants were required to exercise reasonable control and supervision over Zoetis' management, policies, and internal controls.

37.    At all times relevant hereto, the Individual Defendants were the agents of each other and Zoetis and were always acting within the course and scope of such agency.

38. The Individual Defendants were and are also subject to particularized duties pursuant to specific policies in effect at Zoetis.

## A. Duties Under Zoetis' Code Of Conduct

39. Zoetis' Code of Conduct, signed by Defendant Peck, applies to all employees, officers, and directors of the Company. The Code of Conduct requires that all employees, officers, and directors be "honest and trustworthy" in their words and actions.

40. The Code of Conduct requires that:

Investors, government authorities, and others rely on our accurate and complete business records and disclosures. Such information is also essential within the Company so that we can make informed business decisions.

Our books and records must be accurate, timely, complete, and in compliance with accepted accounting principles and our internal controls.

Key Reminders

- Make sure financial entries are clear and complete and do not hide or disguise the true nature of any transaction

- Never record false sales or shipments or record them early, understate or overstate known liabilities and assets, or defer recording items that should be expensed.

- Always be accurate, complete, and truthful when submitting timesheets, research, quality, and safety results.

41. The Code of Conduct obligates fair dealing:

We do not take unfair advantage of anyone through manipulation, concealment, misuse of confidential information, misrepresentation of facts, or any other unfair dealing or practice.

42. The Code of Conduct requires Zoetis colleagues to share any safety, quality, or performance issues concerning a product:

Product quality and safety are extensively monitored during clinical studies; however, it is only after a product has been marketed and used in real-world conditions that its safety profile and performance characteristics can become more completely known. That's why Zoetis colleagues and the third parties we work with

- 13 -

must share in the responsibility of reporting any safety, quality, or performance issues concerning our products.

43. The Code of Conduct further governs the accuracy of Zoetis' product representations: "All promotional materials and communications must be accurate, not misleading, and compliant with all applicable legal and regulatory standards, including any applicable standards addressing substantiation, scientific rigor, and fair balance."

44. The Code of Conduct imposes specific product safety and adverse-event reporting obligations:

> Our customers rely on Zoetis for industry-leading product quality and safety. Understanding a product's safety profile, as well as its quality and performance characteristics, is essential.
>
> Product quality and safety are extensively monitored during clinical studies; however, it is only after a product has been marketed and used in real-world conditions that its safety profile and performance characteristics can become more completely known. That's why Zoetis colleagues and the third parties we work with must share in the responsibility of reporting any safety, quality, or performance issues concerning our products.
>
> - Report all adverse events and product issues. . . .
> - In addition, certain instances that may lead to increased risk of an adverse event, such as medication errors or product defects, should be reported. This reporting should still occur even if adverse events are not currently evident. We have a legal obligation to track and report these experiences and product quality complaints to regulatory authorities.
> - Any information about a product issue must be forwarded to the local country pharmacovigilance team or local country regulatory manager within 24 hours.

45. The Code of Conduct prohibits insider trading and the misuse of material, non-public information:

> In the course of business, you may become aware of material, non-public information about Zoetis or other publicly traded companies. Using this information for personal gain, sharing it with others, or spreading false rumors is not only unfair to other investors — it's illegal.

- Never buy, transfer, gift, or sell any stocks, bonds, options, or other securities of any company, including Zoetis, based on material, non-public information.

- Do not pass on material, non-public information or "tips" to others.
- Know the kinds of information considered inside information. Examples include non-public information about mergers or acquisitions, sales or earnings results, financial forecasts or guidance, changes to the executive management team, pending material lawsuits or major business wins or losses, etc.

46. The Code of Conduct further defines material and non-public information:

Information is material if it is likely that an investor would buy or sell a security as a result of having that information. . . . Information is non-public if it has not been released broadly to the public, e.g., through widely disseminated company communications, such as press releases, external websites, and/or regulatory filings.

**B.    Additional Duties Under Zoetis' Corporate Governance Principles**

47. Zoetis' Corporate Governance Principles ("Governance Principles"), effective November 5, 2024, provide that:

The Board of Directors (the "Board") of the Company, which is elected by the stockholders, is the ultimate decision-making body of the Company, except with respect to those matters reserved to the stockholders. It selects, evaluates and compensates the Chief Executive Officer and reviews the officers directly reporting to the Chief Executive Officer (collectively, "Senior Management"), as well as other officers. Having selected the Chief Executive Officer, the Board acts as an adviser and counselor to Senior Management and ultimately monitors corporate and management performance, including with respect to significant strategic and operational initiatives, taking into consideration the Company's risk profile and exposures and its relationships with key stakeholders, by acting in good faith, with due care and by exercising sound and independent business judgment.

48. The Principles require that a majority of the Board be independent and that the independent directors' meetings "shall be held regularly (at least four times a year) to consider any relevant matters." The Principles further mandate the appointment of a Lead Independent Director whenever the Chair of the Board is the CEO, with responsibilities including to "shall preside over executive sessions of the Company's independent directors, facilitate information flow and communication among the directors and perform such other duties, and exercise such powers, as from time to time shall be prescribed in the Company's By-laws or by the Board."

C. **Additional Duties Of Audit Committee Members**

49. The Audit Committee Charter provides that the Committee's purpose is to:

[D]ischarge the responsibilities delegated by the Board of Directors and to assist the Board of directors in fulfilling its responsibilities relating to: (a) the integrity of the Company's financial statements and the adequacy of its internal controls, (b) the Company's compliance with legal and regulatory requirements, (c) the independence, qualifications and performance of the Company's independent registered public accounting firm and (d) the performance of the Company's internal audit function.

50. The Charter obligates the Committee to review with the Company's independent registered public accounting firm, the internal audit department, and management, among other things, "the adequacy and effectiveness of the Company's systems of internal controls (including management's annual assessment of the adequacy and effectiveness of the such internal control and the related report issued by the independent auditors (as applicable), any significant deficiencies or material weaknesses in the design or operation of and any material changes in such internal controls reported to the Committee by the independent registered public accounting firm or management), accounting practices, and disclosure controls and procedures (and management reports thereon), of the Company and its subsidiaries, and the related report issued by the independent auditors; and "any fraud, whether or not material, involving management or other employees who have a significant role in such internal control over financial reporting, and take such action with respect thereto as may be deemed appropriate."

51. The Charter also emphasizes the Committee's obligation to review with management and the Company's independent registered accounting firm the annual and quarterly financial statements of the Company prior to their filing with the SEC, including, (a) any material changes in accounting principles or practices used in preparing the financial statements prior to the filing of a report on Form 10-K or 10-Q with the SEC; (b) any "critical audit matters" (as defined under PCAOB standards) arising from the current period audit identified by the

independent registered public accounting firm and/or management; (c) disclosures relating to internal controls over financial reporting; (d) the items required by applicable generally accepted auditing standards relating to the conduct of the audit of annual financial statements or review of interim financial statements; (e) the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" included in the Company's Form 10-K or 10-Q filed with the SEC and (f) the form of audit opinion to be issued by the independent registered public accounting firm on the annual financial statements.

52.     The Charter also requires the Committee to "[r]eview and discuss with management and the independent registered public accounting firm (to the extent necessary) earnings press releases, including the type of information to be included and its presentation and the use of "pro forma", "adjusted" or other non-GAAP information (and its reconciliation to GAAP) as well as Company policies with respect to earnings press releases, financial information and earnings guidance, if any, provided to analysts and rating agencies (this function may be performed by the Chair of the Committee)."

53.     The Charter requires the Committee to "[r]eview and discuss with management and the independent registered public accounting firm (to the extent applicable), the Company's internal procedures and controls related to key environmental, social and governance (ESG) external disclosures and reports, including any assurance or verification being provided by the independent registered public accounting firm or other third party with respect to such ESG disclosures."

54.     The Charter further requires the Audit Committee to "[o]versee the Company's Enterprise Risk Management process, including reviewing with management the methodology by which enterprise risk assessment and management are undertaken."

55.     The Charter emphasizes the Audit Committee's role in compliance oversight through reviewing the status of the Company's compliance with laws, regulations, and internal procedures; and (b) the scope and operation of systems designed to promote Company compliance with laws, regulations and internal procedures, through review of reports from management, legal counsel and third parties as determined by the Committee. The Charter also obligates the Committee to obtain and review from the applicable Company Compliance personnel reports on the Company's compliance program, and periodically review with management the implementation and effectiveness of the Company's compliance program.

56.     The Charter obligates the Committee to "[e]stablish and oversee procedures for the confidential and anonymous receipt, retention and treatment of complaints, including those regarding the Company's accounting, internal controls or auditing matters, concerns or any potential violations of Company policy or the law as well as for the confidential, anonymous submissions by Company employees of such concerns."

**D.      Additional Duties Of Corporate Governance Committee Members**

57.     The Corporate Governance Committee Charter requires the Committee to oversee "the Company's corporate governance practices and procedures, including identifying best practices and reviewing at least annually, and recommending" to the Board "for approval any changes" to the Governance Principles. The Charter also requires the Committee to oversee the Board's compliance with the Code of Conduct.

**E.      Additional Duties Of Quality and Innovation Committee Members**

58.     The Corporate Quality and Innovation Charter provides that the Committee's purpose is to:

> [A]ssist the Board of Directors in fulfilling its responsibilities relating to: (i) the Company's compliance with systems and other legal and regulatory requirements

related to manufacturing quality and environmental, ***health and safety matters,***[2] and those relating to research and development matters; and (ii) the Company's strategy, activities, results and investment in research and development and innovation initiatives.

59.     The Charter of the Quality and Innovation Committee imposes specific duties on the members of the Committee including, *inter alia*:

- Periodically reviewing the adequacy of the Company's internal controls, policies, procedures and programs related to ensuring compliance with the applicable legal and regulatory requirements related to manufacturing quality and environmental, health and safety matters, and those relating to research and development matters.

- Periodically reviewing the Company's organizational structure of the supply chain, manufacturing quality, and environmental, health and safety functions.

- Reviewing, evaluating and reporting to the Board of Directors regarding the Company's strategy, activities, results and investment in research and development and innovation initiatives, including the product review and approval/licensure process with regulatory agencies and any significant identified quality or regulatory issues related to the Company's research and development programs, to facilitate the Board's oversight of the Company's long-term innovation strategy and goals.

- Reviewing and discussing with management and reporting to the Board of Directors regarding the Company's programs with respect to: (i) animal care and welfare standards and practices utilized by or on behalf of the Company; (ii) compliance with adverse event reporting requirements; (iii) product safety; and (iv) natural resources and sustainable manufacturing practices.

---

[2] All emphasis is added unless otherwise noted herein.

60.    Overall, the Charter obligates the Committee to be informed on "manufacturing quality, and environmental, health and safety regulations applicable to the Company" and "emerging trends in science and technology applicable to the Company" and periodically report to the Board regarding those trends.

## V.    SUBSTANTIVE ALLEGATIONS

### A.    Company Background

61.    Zoetis discovers, develops, manufactures, and commercializes medicines, vaccines, diagnostic products, and other products and services for the animal health industry. Zoetis was incorporated in Delaware in July 2012 and, before that, operated as the animal health business unit of Pfizer. Zoetis completed its IPO in February 2013, raising approximately $2.2 billion in gross proceeds by selling 86.1 million shares of Class A common stock at $26.00 per share, and Pfizer sold its remaining stake later that year.

62.    Zoetis organizes and manages its commercial operations across two reportable segments — the United States and International — and within those segments delivers a portfolio of products for companion animals and livestock, tailored to local trends and customer needs. The United States segment accounts for approximately 54% of the Company's total revenue, and the International segment accounts for approximately 45% of the Company's total revenue. The Company holds the largest market share in the animal health industry. Its product categories span anti-infectives, vaccines, parasiticides, dermatology, pain and other therapeutics, medicated feed additives, and, following its 2018 acquisition of Abaxis, companion-animal diagnostics.

63.    The Company's products serve both companion animals, including dogs, cats, and horses, and livestock, including cattle, swine, poultry, fish, and sheep. The Company's Companion Animal business is its principal growth engine, generating approximately 70% of the Company's total revenue. As of December 31, 2025, the Company's Companion Animal products accounted

for approximately 83% of the Company's United States revenue and approximately 56% of its International revenue, while the Company's Livestock products accounted for approximately 17% of its United States revenue and approximately 44% of its International revenue.

64.    The Company's flagship Companion Animal products include Librela, Apoquel, Cytopoint, and Simparica Trio, each of which treats medical conditions in dogs. Librela, administered as a once-monthly injection, is used to relieve canine osteoarthritis pain and restore mobility. Apoquel, taken daily as a tablet or chewable, addresses allergic itch. Cytopoint, likewise injectable, is used to manage itch and the dermatologic conditions associated with it. Simparica Trio, a once-monthly oral chewable, combines protection against fleas, ticks, heartworm, and certain intestinal parasites in a single dose.

65.    Because all four flagship Companion Animal products are available in the United States only on the authorization or prescription of a licensed veterinarian, the success of those franchises depends on veterinarians' willingness to recommend and prescribe them and on the products' ability to compete on safety, price, and performance. The safety profile of each product, the Company's response to reports of adverse events in dogs receiving these products, prescribing rates, the pace of veterinarian adoption, the retention of market share against new entrants, and pricing are accordingly the operational drivers of the Companion Animal business's results.

**B.    The Individual Defendants Failed To Oversee Product Safety And Zoetis' Competitive Position**

66.    Librela became one of the Company's most important Companion Animal products following its January 2024 launch in the United States. By 2025, the Company had publicly described Librela as having achieved "blockbuster status" in less than four quarters, becoming the fourth-largest product in the Company's United States pet care portfolio. Thus, the Company's growth narrative for its Companion Animal business depended in significant part on the continued

strength of Librela as a product to treat canine illness and on veterinarians' willingness to prescribe it.

67.     Beginning before the period of the misconduct alleged herein, however, reports of serious adverse events in dogs receiving Librela accumulated. On December 16, 2024, the FDA issued a "Dear Veterinarian Letter" advising veterinarians of those adverse events. The FDA Letter stated that the FDA had completed an evaluation of adverse events in dogs treated with Librela and had discovered severe adverse events such as ataxia, seizures, other neurologic signs, including but not limited to, paresis, recumbency, urinary incontinence, polyuria, and polydipsia. In some cases, death (including euthanasia) was reported as an outcome of these adverse events.

68.     The FDA Letter was followed by an FDA-required update to Librela's product label warning for these neurological and mobility-related adverse events. The FDA's findings and the resulting label update were material developments concerning the safety profile of one of the Company's most important Companion Animal products and bore directly on veterinarians' willingness to prescribe it.

69.     Notwithstanding the importance of Librela to the Company's business and the seriousness of the FDA's findings, the Individual Defendants failed to oversee the Company's response to those findings. The Individual Defendants, including the members of the Quality and Innovation Committee, failed to ensure that the Company appropriately assessed and addressed the safety concerns identified by the FDA, that the Company's adverse-event reporting and pharmacovigilance practices were adequate to the demonstrated risks of Librela, that the Company addressed the impact of the FDA Letter and the label update on veterinarian confidence in and willingness to prescribe Librela, and that the Company fully, accurately and timely disclosed to its

stockholders and the investing public the material safety, regulatory, and demand developments confronting one of its most important products.

70. Instead, the Individual Defendants caused or allowed the Company to minimize the FDA's findings and to reassure investors that veterinarians remained highly satisfied with Librela and would continue to prescribe it, as more fully set forth below.

71. At the same time, the Company's competitive position was deteriorating. The Company's dermatology franchise, anchored by Apoquel and Cytopoint, and its parasiticides franchise, anchored by Simparica Trio, are among the most important contributors to its Companion Animal business and to its overall revenue and growth, and the competitive position of these franchises was a core operational matter that the Individual Defendants were responsible for overseeing.

72. In late 2024, Elanco brought two products to market that bore directly on the Company's leading franchises. In dermatology, Elanco launched Zenrelia, citing head-to-head clinical data to claim comparable or better results than Apoquel at a lower cost. In parasiticides, Elanco launched Credelio Quattro, undercutting Simparica Trio on price and adding tapeworm coverage that Simparica Trio did not provide. These competing products placed sustained pressure on the pricing, growth, and market share of franchises on which the Company's results depended.

73. The Individual Defendants failed to oversee the Company's competitive response. They failed to ensure that the Company adequately assessed the threat posed by Zenrelia and Credelio Quattro to the pricing, growth, and market share of its dermatology and parasiticides franchises, failed to ensure that the Company developed and implemented an appropriate competitive response, and failed to ensure that the Company candidly disclosed to its stockholders the impact of the new competition on its leading franchises.

- 23 -

74.    Instead, the Individual Defendants permitted, and themselves caused, the Company to minimize the competitive threat and to reassure investors that the Company's leading franchises would continue to grow and gain market share, as more fully set forth below.

### C.    The Company, Its Directors And Officers Misrepresent The Company's Companion Animal Business And Competitive Position

75.    Beginning on January 14, 2025, and continuing through May 6, 2026, the Individual Defendants caused, or permitted the Company to make, materially false and misleading statements that portrayed the Company's flagship Companion Animal products as continuing to enjoy strong veterinarian acceptance and competitive strength, even as the safety profile of Librela and the competitive position of the Company's leading franchises were materially deteriorating. Each of these statements was inconsistent with the deteriorating safety profile of, and erosion of veterinarian confidence in, Librela, and with the deteriorating competitive position of the Company's flagship dermatology and parasiticides franchises.

76.    On January 14, 2025, Defendants Peck and Joseph represented Zoetis at the J.P. Morgan Healthcare Conference. Joseph noted that the Company was aggressively expanding its dermatology franchise and continued to see "substantial room to expand this market":

> We built the dermatology market initially with the launch of Apoquel. That was 11 years ago. And despite a decade of sustained, robust growth, we continue to see substantial room to expand this market. We're treating approximately 12 million dogs today for itch. Beyond that, there's 13 million dogs globally that are medicalized and are not receiving a prescription medicine for itch. In addition to that, there are 7 million dogs that are getting all the therapies like steroids. As a market leader, we have a most differentiated set of products to meet the needs of pet owners and veterinarians.

77.    Addressing the FDA's "Dear Veterinarian" letter, Defendant Peck represented that Zoetis was "super excited with the performance of Librela across 2024," that Librela's launch had been "the best launch ever in animal health," and that Zoetis saw "significant value continuing there." Defendant Peck further represented that the FDA's letter was "terribly helpful actually,"

that what the FDA found in its evaluation had been "consistent with what we've been telling them for the last year," and that Zoetis was "continuing to work with the FDA on getting a label update." Addressing competition in the parasiticides market, Defendant Joseph represented that in the prior twelve to eighteen months, in the face of "direct competition for Trio," the Company had "print[ed] 25% growth and gain[ed] market share during that time," and that the Company was "confident in our ability to continue to grow." Joseph also noted that when the Company launched products it was "very, very careful and deliberate about the profile" it wanted to drive and that the Company drove a "high level of satisfaction with these products over time." Joseph highlighted the Company's competitive position, stating that "unless you have real differentiation, it makes it very, very hard to take over."

78.    On February 13, 2025, the Company filed with the SEC a Current Report on Form 8-K attaching a press release announcing the Company's financial results for the fourth quarter and full year 2024 and providing full year 2025 guidance. The Company reported fourth quarter 2024 revenue of $2.3 billion (growing 5%) and net income of $581 million, or $1.29 per diluted share; full year 2024 revenue of $9.3 billion (growing 8%) and net income of $2.5 billion, or $5.47 per diluted share; and adjusted diluted earnings per share of $5.92 for the full year. The Company also provided full year 2025 revenue guidance of $9.225 billion to $9.375 billion and adjusted diluted earnings per share guidance of $6.00 to $6.10, expecting to deliver 6% to 8% organic operational growth in revenue. In the press release, Defendant Peck represented that "Zoetis delivered excellent full year results in 2024, driven by the demand for our innovative products and the strength of our key franchises," and that, "[a]s we approach 2025, we are eager to continue the momentum we realized in 2024, and we are confident that the drivers of our success are sustainable, positioning us for continued above-market growth this year and beyond." Later that

same day, on the Company's conference call with financial analysts and investors to discuss the financial results, Defendant Peck represented that "Librela's US launch is the most successful in our history, cementing its blockbuster status in less than four quarters" and that "[w]e continue to do blind studies with veterinarians and they continue to be very satisfied with the product, and they continue to intend to prescribe." Peck emphasized Librela's position as the "fourth largest product" in its US pet care portfolio.

79.    Defendant Peck further represented that Zoetis had grown Key Dermatology revenue 17% operationally for the year and that, with the dermatology total addressable market projected to grow to $2.5 billion by 2028, Zoetis' "diverse, safe, and effective portfolio supported by strong customer satisfaction, brand loyalty, and future long-acting formulation positions [Zoetis] to lead and expand the [dermatology] market."

80.    On February 27, 2025, Defendant Joseph represented at the Bank of America Securities Animal Health Summit that the FDA-required label update to Librela was "not unexpected" and "in line with what [Zoetis] expected," that having the label update "finalized" with "official approval from the FDA" was "great" because it provided "finality" for "vets and [Zoetis'] field force" who had been engaged in extensive "discussion around" the adverse events on the prior label, that the issue was "effectively behind" Zoetis, and that the label update had been "well-received from customers and consistent with what [Zoetis] told them to expect."

81.    On March 11, 2025, at the Barclays Global Healthcare Conference, Defendant Joseph represented that Librela had been "met with very positive feedback from vets and very consistent with what we've been saying to them for the last several months in terms of what we expect to happen," and that, in dermatology, "we still have more medicalized dogs globally that

are not treated than that are treated with our product. So we think there's substantial [opportunity] to continue to expand those."

82.     On May 6, 2025, the Company filed with the SEC a Current Report on Form 8-K attaching a press release announcing the Company's financial results for the first quarter of 2025 and updating its full year 2025 guidance. The Company reported first quarter 2025 revenue of $2.2 billion (growing 1%, and 9% on an organic operational basis), net income of $631 million, or $1.41 per diluted share, and adjusted diluted earnings per share of $1.48. The Company updated its full year 2025 revenue guidance to $9.425 billion to $9.575 billion and updated its adjusted diluted earnings per share guidance to $6.20 to $6.30. In the press release, Defendant Peck represented that "Zoetis achieved strong results for the first quarter of 2025, driven by demand for our innovative products and our focus on delivering for our customers," and that "[t]hese results reinforce the essential nature of our business, the strength of our diversified portfolio across markets and species and the preference for our innovative products."

83.     Later that same day, on Zoetis' conference call with financial analysts and investors to discuss the financial results, Defendant Joseph represented that Zoetis' Simparica franchise had posted 17% U.S. growth in the quarter on $260 million in revenue, "driven by strong growth in auto ship programs that boost compliance and increase the lifetime value of each dog on treatment," and that, in the face of "additional competitive entrants" that were "accelerating the market's shift to triple combinations," Zoetis "continue[d] to gain share, thanks to the strength of [its] field force, [its] first mover advantage, and ongoing innovation, including expanded label claims." Defendant Joseph also touted the demand from veterinarians for Zoetis' osteoarthritis pain medications Librela and Solensia, representing that Zoetis "remain[ed] confident in the sizable market potential" for those products, that the products' "foundation [was] solid," and that

"record penetration confirm[ed] that veterinarians want better OA solutions." Defendant Joseph also represented that veterinarians who used Librela had shown "86% penetration across clinics" and that the Company "continue[d] to see very strong satisfaction levels for vets who are using the product."

84.    Addressing an analyst question regarding competition in Zoetis' parasiticide market, Defendant Peck represented that Zoetis had "an excellent product" that "continued to compete really well in the market," that Zoetis had a "40% share in puppies," that "once one dog goes on a product, it's rare that it'll switch," and that the puppy-share figure was "a really good indication of where [the business was] going in the future."

85.    On May 22, 2025, at the BNP Paribas Animal Health Day, Defendant Joseph represented that the dermatology market was not one where Zoetis was "sitting and waiting to see what the competition does. This is a market that we've led for a long time and we intend to continue to lead." When an analyst question regarding feedback from the Librela label update, Joseph responded that the "satisfaction level" with Zoetis products was "very strong."

86.    On May 29, 2025, at the Stifel Jaws & Paws Conference, Defendant Joseph represented that in the face of competitor product launches and increased direct-to-consumer marketing of "triple combinations," Zoetis had "been gaining patient share" in the parasiticides market "for quite some time"; that Zoetis' parasiticide portfolio had moved "from fifth globally to second globally"; that Zoetis "continue[d] to be very, very pleased with how Trio [was] performing"; and that Simparica Trio had captured "25% in the first year of competition from the player that [was] actually [the] global leader in parasiticides."

87.    On June 3, 2025, at the William Blair Growth Stock Conference, Defendant Joseph represented that of the "almost 90 million dogs" in the United States, "only about a third" were on

prescription parasiticides and "a third of those" were on triple combinations, such that "the opportunity to continue to expand triple combinations [was] really significant"; that the "growth of that end of the market" would "continue ... for quite some time"; that the opportunity outside the United States was "even more vast" based on lower medicalization rates; and that Zoetis "grew 25% in the first year of head-to-head competition against [its] triple combination."

88.    Joseph also emphasized Zoetis' performance against its rivals representing that "the question [was] who's going to get the most of the expansion opportunities that exist," that Zoetis was "getting a higher share of puppies" getting on its products than its "overall share of dogs or adult dogs," and that Zoetis "grew 25% in the first year of head-to-head competition against [its] triple combination with ... a superior label for [its] product."

89.    On August 5, 2025, the Company filed with the SEC a Current Report on Form 8-K attaching a press release announcing the Company's financial results for the second quarter of 2025 and raising its full year 2025 guidance. The Company reported second quarter 2025 revenue of $2.5 billion (growing 4%, and 8% on an organic operational basis), net income of $718 million, or $1.61 per diluted share, and adjusted diluted earnings per share of $1.76. The Company raised its full year 2025 revenue guidance to $9.450 billion to $9.600 billion and raised its adjusted diluted earnings per share guidance to $6.30 to $6.40. In the press release, Defendant Peck represented that "Zoetis delivered a strong broad-based performance in the second quarter of 2025, with 8% organic operational revenue growth," and that "[o]ur consistent results across economic and competitive cycles reflect the strength of our innovation engine, the breadth of our diversified portfolio and the discipline of our execution in what remains one of the most compelling long-term growth sectors."

90.     Later that same day, on the Company's conference call with financial analysts and investors to discuss the financial results, Defendant Peck represented that Zoetis' "key franchises have significant runway for continued durable growth." With respect to the parasiticides franchise, Defendant Peck represented that Simparica Trio was "setting the standard of care, delivering 20% operational revenue growth," that Trio "remains the trusted first choice for veterinarians and pet owners alike," and that Zoetis benefited from "first mover advantage, strong commercial relationships and preferred position with key veterinary partners," with competitor promotional efforts "often reinforcing our leadership." Defendant Peck further represented that Zoetis expected those dynamics "to continue for the foreseeable future." Defendant Joseph represented that, despite intense competition, Simparica Trio "has not experienced year-over-year patient share loss since competition launched almost 2 years ago," and that Simparica Trio "remains the market leader in the triple combination space and the largest product in the largest therapeutic area in animal health." With respect to the dermatology franchise, Defendant Peck represented that Zoetis' Key Dermatology franchise "continues to deliver, growing 11% operationally, a testament to how durable true innovation can be," that Zoetis "didn't just create the derm category, we continue to expand it," and that Apoquel and Cytopoint together "help vets personalize care, improve compliance and deliver high satisfaction, reducing the likelihood of switching and supporting durable franchise performance." Defendant Joseph likewise represented that the Company "continue[d] to see minimal patient share impact due to competition" in the Company's dermatology franchise.

91.     On the same call, however, Defendant Joseph also disclosed that the Company's combined U.S. osteoarthritis-pain monoclonal-antibody products had declined 12% in the second quarter to $62 million in combined sales, that U.S. sales of Librela had fallen 16% to $45 million,

and that U.S. sales of Solensia had declined 3% to $17 million. Defendant Joseph further conceded that the U.S. ramp-up of Librela "ha[d] not gone according to expectations with headwinds impacting product adoption and creating barriers for vet recommendations," and that international sales of Librela had decelerated to only 1% operational growth, reflecting "social media headwinds, particularly in English-speaking markets." Following these disclosures, on August 5, 2025, the Company's stock price fell $5.69 per share, or approximately 3.8%, from a closing price of $151.81 per share on August 4, 2025 to a closing price of $146.12 per share on August 5, 2025.

92.    On September 8, 2025, at the Morgan Stanley Global Healthcare Conference, Defendant Joseph represented that Simparica Trio was "first to market in the US with [a] triple combination back in 2020" and that its "first to market advantage plus [a] very high level of satisfaction" had positioned Zoetis to lead despite new competitive entrants; that in the "first year, almost two years now" of head-to-head competition, Simparica Trio had "continue[d] to drive strong double-digit growth"; that Zoetis was "continuing to gain share" in the parasiticides market; that "about 45% of the [parasiticides] market" was triple combinations and "60% of new puppies [were] getting on triple combinations," with Zoetis' share of new puppies "higher than [its] overall share"; and that the "leading indicators" supported Zoetis' position in "lead[ing] the expansion of [the parasiticides] space." Defendant Joseph further represented, with respect to Zoetis' dermatology franchise, that Zoetis was "well-positioned to continue to lead in the growth and the expansion of the [dermatology] market globally, even after competitors come in."

93.    On November 4, 2025, the Company filed with the SEC a Current Report on Form 8-K attaching a press release announcing the Company's financial results for the third quarter of 2025 and revising its full year 2025 guidance. The Company reported third quarter 2025 revenue of $2.4 billion (growing 1%, and 4% on an organic operational basis), net income of $721 million,

or $1.63 per diluted share, and adjusted diluted earnings per share of $1.70. The Company revised its full year 2025 revenue guidance downward to $9.400 billion to $9.475 billion and narrowed its organic operational revenue growth guidance to 5.5% to 6.5% "[b]ased on broader macro trends and the operational environment." In the press release, Defendant Peck represented that "[w]hile growth moderated in the third quarter in line with our expectations, we achieved significant regulatory milestones, including major new product approvals, geographic expansions and differentiating lifecycle innovations across products and species," and that, "[w]ith our manufacturing excellence, strong customer relationships and a robust pipeline, we are well positioned to advance animal care, bring new products to market and deliver sustainable growth and value for our shareholders."

94.    Later that same day, on the Company's conference call with financial analysts and investors to discuss the financial results, even as the Company reported declining monoclonal-antibody product sales and intensifying competition, Defendant Peck represented that Zoetis' "resilient growth engine remains strong, fueled by our market-leading innovation and pipeline, a diversified portfolio across species and geographies, global reach and trusted brands that continue to lead their categories." With respect to the parasiticides franchise, Defendant Peck represented that Zoetis "continue[s] to navigate a more competitive U.S. market and hold share with disciplined and focused execution," that Simparica Trio "continues to set the benchmark in the category, supported by the broader strength of the Simparica franchise," and that Zoetis' "first mover advantage, strong retail presence and customer loyalty position us well to sustain momentum across the portfolio." With respect to the dermatology franchise, Defendant Peck represented that Zoetis' Key Dermatology franchise had grown "reflecting the resilience of our

differentiated and innovative portfolio," and that Zoetis was "confident our portfolio will maintain its position as a preferred choice among customers."

95.     On the same call, Defendant Peck disclosed that, "in addition to impact in the U.S., [the Company's] performance in primarily English-speaking international markets ha[d] also been affected by misperceptions amplified on social media, contributing to a 15% operational decline in global Librela sales." Defendant Joseph further disclosed that the Company's global osteoarthritis-pain monoclonal-antibody franchise had declined 11% operationally in the third quarter to $138 million, that U.S. sales of OA pain monoclonal antibodies had fallen 21% to $58 million, and that U.S. sales of Librela had fallen 26% to $41 million. Defendant Joseph also acknowledged that the Company had suffered "modest share loss in the U.S. derm space, primarily driven by competitive discounting and sampling related to new product launches." Following these disclosures, on November 4, 2025, the Company's stock price fell $19.89 per share, or approximately 13.8%, from a closing price of $144.35 per share on November 3, 2025 to a closing price of $124.46 per share on November 4, 2025.

96.     On February 12, 2026, the Company filed with the SEC a Current Report on Form 8-K attaching a press release announcing the Company's financial results for the fourth quarter and full year 2025 and providing full year 2026 guidance. The Company reported fourth quarter 2025 revenue of $2.4 billion (growing 3%) and net income of $603 million, or $1.37 per diluted share; full year 2025 revenue of $9.5 billion (growing 2%, and 6% on an organic operational basis) and net income of $2.7 billion, or $6.02 per diluted share; and adjusted diluted earnings per share of $6.41 for the full year. The Company also provided full year 2026 revenue guidance of $9.825 billion to $10.025 billion and adjusted diluted earnings per share guidance of $7.00 to $7.10, expecting to deliver 3% to 5% organic operational growth in revenue. In the press release,

Defendant Peck represented: "Zoetis delivered solid results in 2025, demonstrating the strength and resilience of our portfolio across species, geographies, and channels. Leadership across key brands and categories drove continued growth, even as we navigated a dynamic operating environment." Defendant Peck further represented: "We continue to compete from a position of strength, anchored in differentiated science, trusted brands, global reach, and enduring customer relationships."

97.    Later that same day, on the Company's conference call with financial analysts and investors to discuss the financial results, Defendant Peck represented that, despite near-term headwinds in the U.S., Zoetis "continued to lead across key brands." With respect to the parasiticides franchise, Defendant Peck represented that, "[g]lobally, Trio maintained its position as the number one selling canine brand, reinforcing its position as the standard of care for broad spectrum coverage in the fastest growing parasiticide segment," and that, "despite an increasingly competitive market, the Simparica franchise gained share globally in 2025." With respect to the dermatology franchise, Defendant Peck represented that Zoetis' Key Dermatology franchise grew 6% operationally for the year, "reflecting the durability of the category we built," and that Zoetis was "competing from a position of strength, built on portfolio diversity and scale." Defendant Peck further represented that Zoetis was "confident in the long-term strength of Librela." In response to an analyst question about competitive pressure in the parasiticides and dermatology spaces, Defendant Joseph represented that the Company had "not seen any significant impact from competitive pressure" and had "seen very limited impact" from competitors.

98.    On the same call, however, Defendant Peck also disclosed that the Company was "operating in a more competitive landscape, including elevated promotional launch activity, which historically has not been sustainable." Defendant Joseph further disclosed that the Company's U.S.

osteoarthritis-pain monoclonal antibodies had declined 25% in the fourth quarter to $53 million in combined revenue, that U.S. sales of Librela had fallen 32% to $36 million in the fourth quarter and 16% for the full year to $169 million, and that the Company's U.S. Companion Animal business as a whole had declined 1% on an organic operational basis. Defendant Peck also disclosed that the Company was projecting full year 2026 organic operational revenue growth of only 3% to 5%, well below the Company's historical mid-to-high-single-digit growth trajectory. Following these disclosures, on February 12, 2026, the Company's stock price fell $3.03 per share, or approximately 2.3%, from a closing price of $128.67 per share on February 11, 2026 to a closing price of $125.64 per share on February 12, 2026.

99.     On March 9, 2026, at the Leerink Global Healthcare Conference, Defendant Joseph represented that, with respect to Simparica Trio's growth in the parasiticides market, that "there's still a lot more room to expand into triple combinations," that competitor product launches were merely "ramping up and therefore [were] cannibalizing some of their legacy sort of achievements in the process," and that "overall, there's significant room here for this market to keep expanding." Defendant Joseph further represented, with respect to Librela, that Zoetis had a "multi-pronged strategy" that it was "gaining more and more confidence in terms of how that's working"; that Zoetis had observed "stabilizing effects" in Librela's "sequential rolling four-week, five-week" sales trends; that Zoetis was gauging veterinarians on "satisfaction levels" and "intent to prescribe"; that those metrics had "elevate[d] from their previous lows"; and that the combination of those metrics "signal[ed] the stabilization of [Librela]."

**D.      The Company Discloses Declining Companion Animal Sales, Intensifying Competition, And Reduces Its 2026 Outlook**

100.     On May 7, 2026, the Company released its first quarter 2026 results, which laid bare a marked deterioration across its core Companion Animal business and prompted a sharp

reduction in its full-year outlook. In a press release attached to a Current Report on Form 8-K, the Company reported revenue of $2.262 billion for the quarter, growing only 3% on a reported basis and flat on an organic operational basis. The Company also reported revenue in its U.S. segment of $1.1 billion, a decrease of 8% on both a reported and an organic operational basis, with U.S. Companion Animal sales declining 11% "due to softer end-market demand and an increasingly competitive landscape." The Company acknowledged that "[t]he company's key dermatology franchise and Simparica Trio faced heightened competitive pressure and persistent macroeconomic-driven price sensitivity," that the U.S. decline was further driven by "the impact of generic competition on the Convenia and Cerenia brands, as well as lower sales of Librela." In the press release, Defendant Peck represented: "Pet owners demonstrated increased price sensitivity, resulting in a decline in veterinary visits and softer demand for premium innovative products, where Zoetis leads. At the same time, competition intensified across key pet care categories, including dermatology and parasiticides."

101.    On the same day, on the Company's first quarter 2026 conference call with financial analysts and investors, Defendant Joseph acknowledged that consumer sentiment was "pressuring aspects of pet owner spend in several key markets" as Zoetis was "facing increased competition globally for Apoquel" and that, despite the Company's "strong label, price ha[d] played a larger role in the decision process." Defendant Joseph further acknowledged that share "loss [was] being amplified by a derm[atology] market with declining patient volume in the clinic," that Zoetis had experienced contraction in the parasiticides market, and that Zoetis was operating in "a more price sensitive and competitive environment." On the same call, Defendants acknowledged that "these new entrants have not yet translated into overall market expansion" and that the contraction in the parasiticides market was negatively impacting prescription volumes and

compliance. Defendant Peck reduced Zoetis' full-year 2026 revenue guidance to $9.680 billion to $9.960 billion, reflecting organic operational revenue growth of only 2% to 5%, further reduced from the 3% to 5% range Defendant Peck had provided just twelve weeks earlier on February 12, 2026, and reduced Zoetis' full-year 2026 adjusted diluted earnings per share guidance to $6.85 to $7.00, from the prior $7.00 to $7.10 range.

102.    Following these disclosures, the Company's stock price fell $23.91 per share, or approximately 21.5%, from a closing price of $111.22 per share on May 6, 2026 to a closing price of $87.31 per share on May 7, 2026, on unusually high trading volume.

### E.    Zoetis' False And Misleading Proxy Statements

103.    On April 9, 2025, the Company filed its Definitive Proxy Statement on Schedule 14A with the SEC (the "2025 Proxy Statement") and solicited stockholder votes to, among other things, elect Defendants Bisaro, Broadhurst, D'Amelio, Hattersley, Khosla, Leatherberry, McCallister, Norden, Parent, Peck, Reed, and Stetter to the Board and approve executive compensation. The 2025 Proxy Statement was authorized by the Board.

104.    The 2025 Proxy Statement represented that the Board, as a whole and through its committees, oversaw the Company's management of risk, including through the Company's enterprise risk management program. With respect to the Board's role in risk oversight, the 2025 Proxy Statement represented:

> As one of its primary responsibilities, the Board as a whole and through each of its Committees oversees the Company's management of risk, including our Enterprise Risk Management ("ERM") program. Our ERM program is designed to identify, assess and mitigate risks through a quantitative and qualitative assessment strategy that considers the nature and immediacy of a particular risk, as well as the likelihood of a risk occurring, and is evaluated and refreshed on an annual basis.… Management . . . provides regular reports to the Board, the Audit Committee, and our executive team on the areas of material risk to the Company, and the Board discusses with management the Company's major and emerging risks, including financial, operational, technological, privacy, cybersecurity, data and physical security, disaster recovery, legal and regulatory.

105. The 2025 Proxy Statement further represented that the Audit Committee's primary responsibilities include overseeing the integrity of the Company's financial statements and system of internal controls, its risk management programs, and reviewing "reports from management, legal counsel and third parties (including [Zoetis']independent public accounting firm) relating to the status of our compliance with laws, regulations and internal procedures."

106. The 2025 Proxy Statement further represented that the Quality and Innovation Committee's primary responsibilities include evaluating Zoetis' "strategy, activities, results and investment in research and development and innovation," overseeing "compliance with processes and internal controls relating to [Zoetis']manufacturing quality and environmental, health and safety ('EHS') programs," reviewing "organizational structures and qualifications of key personnel in our supply chain, manufacturing quality and EHS functions," and overseeing "programs with respect to animal welfare, adverse event reporting and product safety matters."

107. The 2025 Proxy Statement further represented that the Corporate Governance Committee's primary responsibilities include oversight over the "Company's corporate governance practices, policies and procedures."

108. The 2025 Proxy Statement further represented that the Board's "Key Governance Features" included, *inter alia,* that the "Board consists of highly-qualified and experienced directors with relevant expertise for overseeing our strategy, capital allocation, performance, succession planning and risk"; that the Board maintained "Risk oversight by full Board and Committees, including oversight of the Enterprise Risk Management program, financial reporting, information security and audit risk assessments"; and that the Company's "Code of Conduct fosters a culture of honesty and accountability."

109.    The 2025 Proxy Statement represented that Zoetis was dedicated to delivering "strong growth and shareholder value" through its "model of innovation and commercial excellence," and represented that the Company's executive compensation program was "designed to attract, incentivize and reward our leadership for increasing shareholder value and align the interests of leadership with those of our shareholders on an annual and long-term basis." The 2025 Proxy Statement also represented that each of the directors who stood for election had "a strong track record of being a responsible steward of shareholders' interests."

110.    On May 21, 2025, Zoetis filed with the SEC a Current Report on Form 8-K announcing, among other things, the election or reelection of Defendants Bisaro, Broadhurst, D'Amelio, Hattersley, Khosla, Leatherberry, McCallister, Norden, Parent, Peck, Reed, and Stetter, and the approval of executive compensation, pursuant to the solicitations in the 2025 Proxy Statement.

111.    On April 8, 2026, the Company filed its Definitive Proxy Statement on Schedule 14A with the SEC (the "2026 Proxy Statement" and, together with the 2025 Proxy Statement, the "Proxy Statements") and solicited stockholder votes to, among other things, elect Defendants Bisaro, Broadhurst, D'Amelio, Hattersley, Khosla, Leatherberry, McCallister, Norden, Peck, Reed, Stetter, and Tilenius to the Board and approve executive compensation. The 2026 Proxy Statement was authorized by the Board and contained substantially similar representations regarding the Board's oversight of risk, the Company's enterprise risk management program, the primary responsibilities of the Audit Committee, the Quality and Innovation Committee, and the Corporate Governance Committee (renamed in the 2026 Proxy Statement from the Corporate Governance and Sustainability Committee), the Board's commitment to strong and independent governance, and the Company's commitment to creating long-term shareholder value.

112.    These representations in the Proxy Statements were false and misleading and omitted material information. Contrary to the representations made in the Proxy Statements, and as more fully set forth in the Individual Defendants' Duties section above, the Individual Defendants were required but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Zoetis' core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the safety and veterinarian acceptance of Zoetis' flagship Companion Animal products, Zoetis' response to the FDA's safety concerns regarding those products, and the intensifying competitive pressure facing Zoetis' Companion Animal business, from which Zoetis derives approximately 70% of its total revenue; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

113.    On May 20, 2026, Zoetis filed with the SEC a Current Report on Form 8-K announcing, among other things, the election or reelection of Defendants Bisaro, Broadhurst, D'Amelio, Hattersley, Khosla, Leatherberry, McCallister, Norden, Peck, Reed, Stetter, and Tilenius, and the approval of executive compensation, pursuant to the solicitations in the 2026 Proxy Statement.

F.    **Zoetis Is Sued In The Securities Class Action**

114.    On May 27, 2026, the Securities Class Action was filed in the United States District Court for the Southern District of New York against the Company, Defendant Peck, and Defendant Joseph, asserting claims under Sections 10(b) and 20(a) of the Exchange Act on behalf of all persons and entities that purchased or otherwise acquired Zoetis securities between January 14, 2025 and May 6, 2026, inclusive. The plaintiff asserts that the named defendants issued materially

false and misleading statements and omitted material facts concerning the safety and veterinarian acceptance of the Company's flagship Companion Animal products, including Librela, the impact of competition on the Company's leading dermatology and parasiticides franchises, and the strength and sustainability of the Company's Companion Animal business. As a result, the Company will incur substantial costs defending itself and its officers in the Securities Class Action and faces further substantial costs in the event of an adverse judgment.

### G.     Insider Sales By The Insider Seller Defendants

115.    While the Company's stock price was artificially inflated by the misrepresentations and omissions alleged herein, and before the deterioration of the Companion Animal business was fully revealed, Defendants Peck and Reed (the "Insider Seller Defendants") sold 21,210 shares, reaping proceeds of more than $2.7 million, while in possession of material nonpublic information concerning the Company's business and prospects.

116.    Defendant Peck sold 20,000 shares of Zoetis common stock on February 17, 2026, at weighted-average prices of $126.4601 (for 9,200 shares) and $127.5492 (for 10,800 shares), for proceeds of approximately $2,540,964. Defendant Peck acquired the 20,000 shares earlier the same day through the exercise of stock options at a strike price of $41.83 per share, yielding a net personal gain of approximately $1,704,400. The transaction was effected pursuant to a Rule 10b5-1 trading plan that Defendant Peck adopted on September 12, 2025 — within the period of the misconduct alleged herein, and less than two months before the Company disclosed declining Companion Animal sales on November 4, 2025. Defendant Peck adopted the trading plan while in possession of material nonpublic information concerning deteriorating veterinarian and pet-owner adoption of Librela, accelerating competitive losses in the Company's Key Dermatology and parasiticides franchises, and the failure of the Board's oversight of product safety and competitive position. Defendant Peck reaped a material personal benefit not shared with other

Zoetis stockholders from the misconduct pled herein, and she has a substantial likelihood of liability therefor.

117. Defendant Reed sold 1,210 shares of personally held Zoetis common stock on March 11, 2025, at $166.14 per share, for proceeds of approximately $201,029, while in possession of material nonpublic information concerning, among other things, deteriorating veterinarian and pet-owner adoption of the Company's Companion Animal monoclonal-antibody products and the inadequacy of the Company's product-safety and adverse-event-reporting oversight. Defendant Reed served at the time of this sale as Chair of the Board's Quality and Innovation Committee, with explicit oversight responsibility over "animal welfare, adverse event reporting and product safety matters." Defendant Reed reaped a material personal benefit not shared with other Zoetis stockholders from the misconduct pled herein, and he has a substantial likelihood of liability therefor.

118. The Insider Seller Defendants sold Zoetis common stock as set forth below:

| Defendant | Date | Shares Sold | Proceeds |
|---|---|---|---|
| Peck | February 17, 2026 | 20,000 | $2,540,964 |
| Reed | March 11, 2025 | 1,210 | $201,029 |

## H. The Individual Defendants Cause The Company To Repurchase Its Shares At Artificially Inflated Prices

119. Between January 2025 and March 2026, the Individual Defendants caused or permitted Zoetis to repurchase its own shares at prices that were artificially inflated by the misrepresentations and omissions alleged herein. According to the Company's public filings, Zoetis repurchased over 28.9 million shares of its own common stock for approximately $3.8 billion during that period.

120.   Specifically, the Company's own public filings reflect the following repurchases of its common stock:

| Dates of Stock Repurchase | Number of Shares Repurchased | Average Price Per Share | Total Cost of Repurchase |
|---|---|---|---|
| January 1 to January 31, 2025 | 570,167 | $168.27 | $95,942,001 |
| February 1 to February 28, 2025 | 1,452,075 | $163.88 | $237,966,051 |
| March 1 to March 31, 2025 | 777,049 | $164.88 | $128,119,839 |
| April 1 to April 30, 2025 | 813,748 | $151.49 | $123,274,684 |
| May 1 to May 31, 2025 | 537,006 | $158.86 | $85,308,773 |
| June 1 to June 30, 2025 | 790,407 | $162.72 | $128,615,027 |
| July 1 to July 31, 2025 | 709,538 | $153.69 | $109,048,895 |
| August 1 to August 31, 2025 | 967,711 | $151.24 | $146,356,611 |
| September 1 to September 30, 2025 | 813,872 | $149.64 | $121,787,806 |
| October 1 to October 31, 2025 | 775,688 | $144.58 | $112,148,971 |
| November 1 to November 30, 2025 | 2,342,900 | $121.99 | $285,810,371 |
| December 1 to December 31, 2025 | 13,450,458 | $123.54 | $1,661,669,581 |
| January 1 to January 31, 2026 | 2,622,327 | $125.96 | $330,308,308 |
| February 1 to February 28, 2026 | 1,089,066 | $127.11 | $138,431,179 |
| March 1 to March 31, 2026 | 1,239,514 | $121.40 | $150,476,999 |

121.   Measured against the post-disclosure closing price of $87.31 per share on May 7, 2026, those more than 28.9 million shares were worth only approximately $2.5 billion. The Individual Defendants thus caused the Company to overpay by approximately $1.3 billion for shares it repurchased at prices the misrepresentations and omissions alleged herein had artificially inflated.

I.   **Damage To The Company**

122.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary duties and other misconduct alleged herein, Zoetis has been and will continue to be damaged. The damage includes, without limitation: (a) the costs of defending the Securities Class

- 43 -

Action and any liability the Company faces as a result of an adverse judgment or settlement therein; (b) the corporate assets wasted on share repurchases at artificially inflated prices; (c) the costs of remediating the deficiencies in the Company's internal controls and risk-oversight functions; (d) the compensation and benefits, including equity compensation tied to the Company's artificially inflated stock price, paid to the Individual Defendants who breached their fiduciary duties to the Company, none of which the Board has clawed back; (e) the reputational harm caused by the disclosure of the deterioration of the Company's Companion Animal business and the Individual Defendants' failure to oversee the material risks confronting that business; and (f) the increased cost of capital resulting from the decline in the Company's stock price and the harm to the Company's reputation and goodwill.

## VI.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

123.    Plaintiff brings this action derivatively and for the benefit of Zoetis to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties and violations of federal securities laws as directors and officers of Zoetis and other misconduct.

124.    Zoetis is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

125.    Plaintiff is, and has been at all relevant times, a stockholder of Zoetis and was a stockholder of the Company at the time of the misconduct alleged herein. Plaintiff will adequately and fairly represent the interests of Zoetis in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to prosecute this action.

126.    Demand upon the Board to institute this action against the Individual Defendants would be futile and is, therefore, excused. The Board is neither disinterested nor independent.

## A.    Demand Upon Defendant Bisaro Is Excused

127.    Bisaro authorized the Proxy Statements containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor. Bisaro benefited from the violation of Section 14(a) of the Exchange Act pled herein by securing his reelection to the Zoetis Board through the false and misleading statements and material omissions in the Proxy Statements.

128.    Bisaro, as a member of the Quality and Innovation Committee, had duties regarding the oversight of Zoetis' programs with respect to animal welfare, adverse event reporting, and product safety matters. Bisaro utterly failed to perform these essential duties.

129.    As a director of Zoetis, Bisaro was required, but failed, to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Zoetis' core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the safety and veterinarian acceptance of Zoetis' flagship Companion Animal products, Zoetis' response to the FDA's safety concerns regarding those products, and the intensifying competitive pressure facing Zoetis' Companion Animal business, from which Zoetis derives approximately 70% of its total revenue; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls. Had Bisaro taken timely action, the damage caused to Zoetis could have been prevented or at least minimized.

130.    Bisaro is neither disinterested nor independent and faces a substantial likelihood of liability for the claims asserted herein. Any demand upon Defendant Bisaro is futile and, thus, excused.

B.    **Demand Upon Defendant Broadhurst Is Excused**

131.    Broadhurst authorized the Proxy Statements containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

132.    Broadhurst benefited from the violation of Section 14(a) of the Exchange Act pled herein by securing her reelection to the Zoetis Board through the false and misleading statements and material omissions in the Proxy Statements.

133.    Broadhurst, as a member of the Quality and Innovation Committee, had duties regarding the oversight of Zoetis' programs with respect to animal welfare, adverse event reporting, and product safety matters. Broadhurst utterly failed to perform these essential duties.

134.    Broadhurst, as a member of the Corporate Governance Committee, had the duty, among others, to ensure the implementation and effectiveness of Zoetis' corporate governance practices, policies, and procedures. Broadhurst utterly failed to perform these duties.

135.    As a director of Zoetis, Broadhurst was required, but failed, to: (1) implement and maintain an effective system of internal controls to ensure that Zoetis was complying with all laws, rules, and regulations governing Zoetis' core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the safety and veterinarian acceptance of Zoetis' flagship Companion Animal products, Zoetis' response to the FDA's safety concerns regarding those products, and the intensifying competitive pressure facing Zoetis' Companion Animal business, from which Zoetis derives approximately 70% of its total revenue; (2) effectively oversee and monitor the material risks facing Zoetis; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls. Had Broadhurst taken timely action, the damage caused to Zoetis could have been prevented or at least minimized.

136. Broadhurst is neither disinterested nor independent and faces a substantial likelihood of liability for the claims asserted herein. Any demand upon Defendant Broadhurst is futile and, thus, excused.

### C. Demand Upon Defendant D'Amelio Is Excused

137. D'Amelio served as Executive Vice President and CFO of Pfizer from September 2007 through 2022, including throughout the period during which Pfizer conceptualized and executed the divestiture of its animal health business that created Zoetis as a standalone public company. During approximately five of those years, from 2007 through 2012, Defendant Peck served at Pfizer in increasingly senior roles, culminating in Executive Vice President, Worldwide Business Development and Innovation, and as a member of Pfizer's Executive Leadership Team alongside D'Amelio. As Pfizer's CFO, D'Amelio led the divestiture of Pfizer's animal health business and was, in Zoetis' own words, "instrumental in conceptualizing and establishing the Company as a standalone entity from Pfizer." Peck transitioned from Pfizer's Worldwide Business Development and Innovation function to Zoetis following its 2013 IPO and has continued at Zoetis ever since, becoming CEO in 2020. D'Amelio and Peck therefore cannot consider a demand to take action against each other with the required independence and disinterest.

138. D'Amelio has served on the board of directors of Humana Inc. ("Humana") continuously since September 2003. During approximately nine of those years, from September 2003 through December 2012, Defendant McCallister served as Humana's CEO, and from 2010 through 2014 McCallister served as Humana's Chairman. Thus, D'Amelio served as a director of a public company led by McCallister, to whom D'Amelio reported. D'Amelio and McCallister therefore cannot consider a demand to take action against each other with the required independence and disinterest.

139. D'Amelio authorized the Proxy Statements containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

140. D'Amelio benefited from the violation of Section 14(a) of the Exchange Act pled herein by securing his reelection to the Zoetis Board through the false and misleading statements and material omissions in the Proxy Statements.

141. D'Amelio, as a member of the Audit Committee, had duties regarding oversight of the risks facing Zoetis, Zoetis' compliance with relevant laws, rules, and regulations, the integrity of Zoetis' financial statements, and the review of earnings releases and financial guidance. D'Amelio utterly failed to perform these essential duties.

142. D'Amelio, as Chair of the Human Resources Committee, had the duty, among others, to oversee Zoetis' executive compensation programs and to ensure that executive compensation aligned with Zoetis' actual operating performance and was supported by accurate disclosures of that performance. D'Amelio utterly failed to perform these duties.

143. As a director of Zoetis, D'Amelio was required, but failed, to: (1) implement and maintain an effective system of internal controls to ensure that Zoetis was complying with all laws, rules, and regulations governing Zoetis' core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the safety and veterinarian acceptance of Zoetis' flagship Companion Animal products, Zoetis' response to the FDA's safety concerns regarding those products, and the intensifying competitive pressure facing Zoetis' Companion Animal business, from which Zoetis derives approximately 70% of its total revenue; (2) effectively oversee and monitor the material risks facing Zoetis; and (3) investigate and take action when presented with red flags regarding

misconduct or the lack of internal controls. Had D'Amelio taken timely action, the damage caused to Zoetis could have been prevented or at least minimized.

144. D'Amelio is neither disinterested nor independent and faces a substantial likelihood of liability for the claims asserted herein. Any demand upon Defendant D'Amelio is futile and, thus, excused.

### D. Demand Upon Defendant Hattersley Is Excused

145. Hattersley authorized the Proxy Statements containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

146. Hattersley benefited from the violation of Section 14(a) of the Exchange Act pled herein by securing his reelection to the Zoetis Board through the false and misleading statements and material omissions in the Proxy Statements.

147. Hattersley, as Chair of the Corporate Governance Committee, had the duty, among others, to ensure the implementation and effectiveness of Zoetis' corporate governance practices, policies, and procedures. Hattersley utterly failed to perform these essential duties.

148. As a director of Zoetis, Hattersley was required, but failed, to: (1) implement and maintain an effective system of internal controls to ensure that Zoetis was complying with all laws, rules, and regulations governing Zoetis' core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the safety and veterinarian acceptance of Zoetis' flagship Companion Animal products, Zoetis' response to the FDA's safety concerns regarding those products, and the intensifying competitive pressure facing Zoetis' Companion Animal business, from which Zoetis derives approximately 70% of its total revenue; (2) effectively oversee and monitor the material risks facing Zoetis; and (3) investigate and take action when presented with red flags regarding

misconduct or the lack of internal controls. Had Hattersley taken timely action, the damage caused to Zoetis could have been prevented or at least minimized.

149. Hattersley is neither disinterested nor independent and faces a substantial likelihood of liability for the claims asserted herein. Any demand upon Defendant Hattersley is futile and, thus, excused.

### E. Demand Upon Defendant Khosla Is Excused

150. Khosla authorized the Proxy Statements containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor. Khosla benefited from the violation of Section 14(a) of the Exchange Act pled herein by securing his reelection to the Zoetis Board through the false and misleading statements and material omissions in the Proxy Statements.

151. Khosla, as a member of the Quality and Innovation Committee, had duties regarding the oversight of Zoetis' programs with respect to animal welfare, adverse event reporting, and product safety matters. Khosla utterly failed to perform these essential duties.

152. As a director of Zoetis, Khosla was required, but failed, to: (1) implement and maintain an effective system of internal controls to ensure that Zoetis was complying with all laws, rules, and regulations governing Zoetis' core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the safety and veterinarian acceptance of Zoetis' flagship Companion Animal products, Zoetis' response to the FDA's safety concerns regarding those products, and the intensifying competitive pressure facing Zoetis' Companion Animal business, from which Zoetis derives approximately 70% of its total revenue; (2) effectively oversee and monitor the material risks facing Zoetis; and (3) investigate and take action when presented with red flags regarding

misconduct or the lack of internal controls. Had Khosla taken timely action, the damage caused to Zoetis could have been prevented or at least minimized.

153.    Khosla is neither disinterested nor independent and faces a substantial likelihood of liability for the claims asserted herein. Any demand upon Defendant Khosla is futile and, thus, excused.

### F.    Demand Upon Defendant Leatherberry Is Excused

154.    Leatherberry authorized the Proxy Statements containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

155.    Leatherberry benefited from the violation of Section 14(a) of the Exchange Act pled herein by securing her reelection to the Zoetis Board through the false and misleading statements and material omissions in the Proxy Statements.

156.    Leatherberry, as a member of the Audit Committee, had duties regarding oversight of the risks facing Zoetis, Zoetis' compliance with relevant laws, rules, and regulations, the integrity of Zoetis' financial statements, and the review of earnings releases and financial guidance. Leatherberry utterly failed to perform these essential duties.

157.    As a director of Zoetis, Leatherberry was required, but failed, to: (1) implement and maintain an effective system of internal controls to ensure that Zoetis was complying with all laws, rules, and regulations governing Zoetis' core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the safety and veterinarian acceptance of Zoetis' flagship Companion Animal products, Zoetis' response to the FDA's safety concerns regarding those products, and the intensifying competitive pressure facing Zoetis' Companion Animal business, from which Zoetis derives approximately 70% of its total revenue; (2) effectively oversee and monitor the material risks facing Zoetis; and (3) investigate and take action when presented with red flags regarding

misconduct or the lack of internal controls. Had Leatherberry taken timely action, the damage caused to Zoetis could have been prevented or at least minimized.

158. Leatherberry is neither disinterested nor independent and faces a substantial likelihood of liability for the claims asserted herein. Any demand upon Defendant Leatherberry is futile and, thus, excused.

## G. Demand Upon Defendant McCallister Is Excused

159. McCallister has served as Chairman of the Zoetis Board since Zoetis' IPO in 2013. McCallister served as CEO of Humana from 2000 through December 2012 and as Chairman of Humana from 2010 through 2014. During McCallister's tenure as CEO and Chairman of Humana, Defendant D'Amelio served continuously as a director of Humana, beginning in September 2003, such that, for approximately nine years, D'Amelio served on the board of a public company which was led by McCallister. McCallister and D'Amelio therefore cannot consider a demand to take action against each other with the required independence and disinterest.

160. As Chairman of the Board throughout the period of the misconduct alleged herein, McCallister bore overall responsibility for the Board's discharge of its oversight obligations to Zoetis. McCallister utterly failed to perform that duty, allowing the Company to remain with inadequate internal controls, to continue marketing its flagship Companion Animal products despite a failure to address key product safety concerns, and to issue materially false and misleading statements about the safety of its products, veterinarian acceptance of its products, and the Company's competitive position, as alleged herein.

161. McCallister authorized the Proxy Statements containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

162.    McCallister benefited from the violation of Section 14(a) of the Exchange Act pled herein by securing his reelection to the Zoetis Board through the false and misleading statements and material omissions in the Proxy Statements.

163.    As a director and Chairman of Zoetis, McCallister was required, but failed, to: (1) implement and maintain an effective system of internal controls to ensure that Zoetis was complying with all laws, rules, and regulations governing Zoetis' core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the safety and veterinarian acceptance of Zoetis' flagship Companion Animal products, Zoetis' response to the FDA's safety concerns regarding those products, and the intensifying competitive pressure facing Zoetis' Companion Animal business, from which Zoetis derives approximately 70% of its total revenue; (2) effectively oversee and monitor the material risks facing Zoetis; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls. Had McCallister taken timely action, the damage caused to Zoetis could have been prevented or at least minimized.

164.    McCallister is neither disinterested nor independent and faces a substantial likelihood of liability for the claims asserted herein. Any demand upon Defendant McCallister is futile and, thus, excused.

## H.    Demand Upon Defendant Norden Is Excused

165.    Norden authorized the Proxy Statements containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

166.    Norden benefited from the violation of Section 14(a) of the Exchange Act pled herein by securing his reelection to the Zoetis Board through the false and misleading statements and material omissions in the Proxy Statements.

167. Norden, as Chair of the Audit Committee, had duties regarding oversight of the risks facing Zoetis, Zoetis' compliance with relevant laws, rules, and regulations, the integrity of Zoetis' financial statements, and the review of earnings releases and financial guidance. Norden utterly failed to perform these essential duties.

168. As a director of Zoetis, Norden was required, but failed, to: (1) implement and maintain an effective system of internal controls to ensure that Zoetis was complying with all laws, rules, and regulations governing Zoetis' core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the safety and veterinarian acceptance of Zoetis' flagship Companion Animal products, Zoetis' response to the FDA's safety concerns regarding those products, and the intensifying competitive pressure facing Zoetis' Companion Animal business, from which Zoetis derives approximately 70% of its total revenue; (2) effectively oversee and monitor the material risks facing Zoetis; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls. Had Norden taken timely action, the damage caused to Zoetis could have been prevented or at least minimized.

169. Norden is neither disinterested nor independent and faces a substantial likelihood of liability for the claims asserted herein. Any demand upon Defendant Norden is futile and, thus, excused.

## I.   Demand Upon Defendant Peck Is Excused

170. Peck serves as Zoetis' CEO. Peck therefore is not independent. As an employee of Zoetis, Zoetis provides Defendant Peck with her principal occupation from which she receives substantial compensation, including approximately $17,206,760 in fiscal year 2024 and approximately $19,046,509 in fiscal year 2025. Peck could not consider a demand for action that

might require her to sue the directors who control her continued employment and substantial compensation or fellow members of management with whom she works on a day-to-day basis.

171. Peck served at Pfizer from 2004 through 2012, culminating in her role as Executive Vice President, Worldwide Business Development and Innovation, and as a member of Pfizer's Executive Leadership Team. During approximately five of those years, from September 2007 through 2012, Defendant D'Amelio served as Pfizer's Chief Financial Officer and as a fellow member of Pfizer's Executive Leadership Team alongside Peck. D'Amelio, as Pfizer's Chief Financial Officer, led the divestiture of Pfizer's animal health business that created Zoetis and was, in Zoetis' own words, "instrumental in conceptualizing and establishing the Company as a standalone entity from Pfizer." Peck transitioned from Pfizer's Worldwide Business Development and Innovation function to Zoetis following its 2013 IPO. Peck and D'Amelio therefore cannot consider a demand to take action against each other with the required independence and disinterest.

172. Peck is a named defendant in the Securities Class Action and faces a substantial likelihood of personal liability therefor.

173. Peck authorized the Proxy Statements containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

174. Peck benefited from the violation of Section 14(a) of the Exchange Act pled herein by securing her reelection to the Zoetis Board through the false and misleading statements and material omissions in the Proxy Statements.

175. Peck had a powerful incentive to inflate Zoetis' stock price through the false and misleading statements alleged herein in order to profit from insider stock sales. On February 17, 2026, Peck sold 20,000 shares of Zoetis common stock, yielding illicit proceeds of approximately $2,540,964 and a net personal gain of approximately $1,704,400, while in possession of material

adverse non-public information. Thus, through materially false and misleading statements to the market about the safety, veterinarian acceptance, and competitive position of Zoetis' flagship Companion Animal products, Peck sold Zoetis stock at artificially inflated prices, reaping a material personal benefit not shared with other Zoetis stockholders from the misconduct pled herein and she has a substantial likelihood of liability therefor.

176. As CEO and a director of Zoetis, Peck was required, but failed, to: (1) implement and maintain an effective system of internal controls to ensure that Zoetis was complying with all laws, rules, and regulations governing Zoetis' core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the safety and veterinarian acceptance of Zoetis' flagship Companion Animal products, Zoetis' response to the FDA's safety concerns regarding those products, and the intensifying competitive pressure facing Zoetis' Companion Animal business, from which Zoetis derives approximately 70% of its total revenue; (2) effectively oversee and monitor the material risks facing Zoetis; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls. Had Peck taken timely action, the damage caused to Zoetis could have been prevented or at least minimized.

177. Peck is neither disinterested nor independent and faces a substantial likelihood of liability for the claims asserted herein. Any demand upon Defendant Peck is futile and, thus, excused.

**J.      Demand Upon Defendant Reed Is Excused**

178. Reed authorized the Proxy Statements containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

179.    Reed benefited from the violation of Section 14(a) of the Exchange Act pled herein by securing his reelection to the Zoetis Board through the false and misleading statements and material omissions in the Proxy Statements.

180.    Reed, as Chair of the Quality and Innovation Committee, had duties regarding the oversight of Zoetis' programs with respect to animal welfare, adverse event reporting, and product safety matters. Reed utterly failed to perform these essential duties.

181.    Reed had a powerful incentive to inflate Zoetis' stock price through the false and misleading statements alleged herein in order to profit from insider stock sales. On March 11, 2025, Reed sold 1,210 shares of personally held Zoetis common stock, reaping proceeds of approximately $201,029, while in possession of material adverse non-public information. Thus, through materially false and misleading statements to the market about the safety, veterinarian acceptance, and competitive position of Zoetis' flagship Companion Animal products, Reed sold Zoetis stock at artificially inflated prices, reaping a material personal benefit not shared with other Zoetis stockholders from the misconduct pled herein and he has a substantial likelihood of liability therefor.

182.    As a director of Zoetis, Reed was required, but failed, to: (1) implement and maintain an effective system of internal controls to ensure that Zoetis was complying with all laws, rules, and regulations governing Zoetis' core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the safety and veterinarian acceptance of Zoetis' flagship Companion Animal products, Zoetis' response to the FDA's safety concerns regarding those products, and the intensifying competitive pressure facing Zoetis' Companion Animal business, from which Zoetis derives approximately 70% of its total revenue; (2) effectively oversee and monitor the material

risks facing Zoetis; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls. Had Reed taken timely action, the damage caused to Zoetis could have been prevented or at least minimized.

183. Reed is neither disinterested nor independent and faces a substantial likelihood of liability for the claims asserted herein. Any demand upon Defendant Reed is futile and, thus, excused.

### K. Demand Upon Defendant Stetter Is Excused

184. Stetter, the Dean of the University of California, Davis School of Veterinary Medicine and the former Dean of the Colorado State University College of Veterinary Medicine and Biomedical Sciences, was selected for the Zoetis Board in recognition of his deep veterinary medicine expertise, including in matters of product safety, adverse event reporting, and veterinary practice. Notwithstanding that expertise, Stetter caused or allowed Zoetis to continue marketing its flagship Companion Animal products despite inadequate internal controls at the Company and to issue the materially false and misleading statements alleged herein.

185. Stetter authorized the Proxy Statements containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

186. Stetter benefited from the violation of Section 14(a) of the Exchange Act pled herein by securing his reelection to the Zoetis Board through the false and misleading statements and material omissions in the Proxy Statements.

187. Stetter, as a member of the Quality and Innovation Committee, had duties regarding the oversight of Zoetis' programs with respect to animal welfare, adverse event reporting, and product safety matters. Stetter utterly failed to perform these essential duties.

188. Stetter, as a member of the Human Resources Committee, had the duty, among others, to oversee Zoetis' executive compensation programs and to ensure that executive

compensation aligned with Zoetis' actual operating performance and was supported by accurate disclosures of that performance. Stetter utterly failed to perform these duties.

189. As a director of Zoetis, Stetter was required, but failed, to: (1) implement and maintain an effective system of internal controls to ensure that Zoetis was complying with all laws, rules, and regulations governing Zoetis' core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the safety and veterinarian acceptance of Zoetis' flagship Companion Animal products, Zoetis' response to the FDA's safety concerns regarding those products, and the intensifying competitive pressure facing Zoetis' Companion Animal business, from which Zoetis derives approximately 70% of its total revenue; (2) effectively oversee and monitor the material risks facing Zoetis; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls. Had Stetter taken timely action, the damage caused to Zoetis could have been prevented or at least minimized.

190. Stetter is neither disinterested nor independent and faces a substantial likelihood of liability for the claims asserted herein. Any demand upon Defendant Stetter is futile and, thus, excused.

## L.      Demand Upon Defendant Tilenius Is Excused

191. Tilenius authorized the 2026 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

192. Tilenius benefited from the violation of Section 14(a) of the Exchange Act pled herein by securing her election to the Zoetis Board through the false and misleading statements and material omissions in the 2026 Proxy Statement.

193. Tilenius, as a member of the Audit Committee, had duties regarding oversight of the risks facing Zoetis, Zoetis' compliance with relevant laws, rules, and regulations, the integrity

of Zoetis' financial statements, and the review of earnings releases and financial guidance. Tilenius utterly failed to perform these essential duties.

194. Tilenius, as a member of the Human Resources Committee, had the duty, among others, to oversee Zoetis' executive compensation programs and to ensure that executive compensation aligned with Zoetis' actual operating performance and was supported by accurate disclosures of that performance. Tilenius utterly failed to perform these duties.

195. As a director of Zoetis, Tilenius was required, but failed, to: (1) implement and maintain an effective system of internal controls to ensure that Zoetis was complying with all laws, rules, and regulations governing Zoetis' core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the safety and veterinarian acceptance of Zoetis' flagship Companion Animal products, Zoetis' response to the FDA's safety concerns regarding those products, and the intensifying competitive pressure facing Zoetis' Companion Animal business, from which Zoetis derives approximately 70% of its total revenue; (2) effectively oversee and monitor the material risks facing Zoetis; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls. Had Tilenius taken timely action, the damage caused to Zoetis could have been prevented or at least minimized.

196. Tilenius is neither disinterested nor independent and faces a substantial likelihood of liability for the claims asserted herein. Any demand upon Defendant Tilenius is futile and, thus, excused.

**M.     Other Factors Demonstrating That Demand Upon The Zoetis Board Is Excused**

197.     Zoetis has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Board has not caused the Company to take action to recover for the Company the damages it has suffered and will continue to suffer thereby.

198.     The members of the Board received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board. They have thus benefited from the wrongs herein alleged and have engaged themselves in self-dealing.

199.     Publicly traded companies, such as Zoetis, typically carry director and officer liability insurance ("D&O Insurance") from which the Company could potentially recover some or all of its losses. However, such insurance typically has limited coverage for actions within the scope of this Complaint—particularly where, as here, the insured directors are the very defendants from whom the Company seeks to recover, creating an "insured versus insured" exclusion that forecloses recovery if the directors voluntarily institute suit against themselves. The Board has not even attempted to pursue a recovery of the Company's damages from the D&O carrier.

**VII.     CLAIMS FOR RELIEF**

<u>**COUNT I**</u>
**Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5**
<u>**(Derivatively on Behalf of Zoetis Against the Individual Defendants)**</u>

200.     Plaintiff incorporates by reference and re-alleges each allegation set forth above as though fully set forth herein.

201.     During the period of the misconduct alleged herein, the Individual Defendants caused or permitted the Company to repurchase its own shares at prices artificially inflated by the misrepresentations and omissions alleged herein. The Individual Defendants caused Zoetis to

repurchase over 28.9 million shares of its own common stock for approximately $3.8 billion while in possession of material, non-public information concerning the deteriorating safety profile and competitive position of the Company's flagship Companion Animal products, the erosion of veterinarian demand, and the resulting decline in the Company's Companion Animal business.

202.    At all relevant times, in connection with Zoetis's repurchases of its own shares, the Individual Defendants made, disseminated, or approved false and misleading statements about the Company, omitting material information specified herein, which they knew or deliberately disregarded as false, misleading, or incomplete, intending to deceive, manipulate, or defraud. These false, misleading, or incomplete statements and the Individual Defendants' course of conduct were designed to artificially inflate the price of the Company's common stock. As officers and directors of Zoetis, the Individual Defendants were directly responsible for and are liable for all materially false, misleading, or incomplete statements made during the period of the misconduct alleged herein.

203.    The Individual Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 by (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts or omitting material facts necessary to make the statements not misleading, given the circumstances; and (c) engaging in acts, practices, and a course of business that operated as a fraud or deceit upon the Company in connection with its purchases of Zoetis common stock.

204.    The Company has been damaged as a result of the Individual Defendants' violations of Section 10(b) and Rule 10b-5 by the Company's purchase of its own shares at artificially inflated prices, wasting in excess of $1.3 billion in corporate assets when measured against the post-disclosure closing price of $87.31 per share on May 7, 2026.

205.     The Individual Defendants acted with scienter, either intending to deceive, manipulate, or defraud, or with severe recklessness. As set forth herein, the Individual Defendants were responsible for the management, oversight, and public disclosure of Zoetis's operations and financial results, had access to internal reports and information reflecting the deteriorating condition of the Company's Companion Animal business, and caused or permitted the Company to execute share repurchases while that information remained concealed from the public.

206.     Plaintiff brings this claim within two years of discovering the facts constituting the violation and within five years of the violation.

**COUNT II**
**Violation of Section 14(a) of the Exchange Act**
**(Derivatively on Behalf of Zoetis Against the Individual Defendants)**

207.     Plaintiff incorporates by reference and re-alleges each allegation set forth above as though fully set forth herein.

208.     The Section 14(a) claim alleged herein is based solely on negligence. It is not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claim alleged herein does not allege and does not sound in fraud. Plaintiff specifically disclaims any allegations of reliance upon any allegation of, or reference to, any allegation of fraud, scienter, or recklessness with regard to this non-fraud claim.

209.     Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

210. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

211. The Proxy Statements were materially false and misleading because the Individual Defendants were required, but failed, to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Zoetis's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the safety and veterinarian acceptance of Zoetis' flagship Companion Animal products, Zoetis' response to the FDA's safety concerns regarding those products, and the intensifying competitive pressure facing Zoetis' Companion Animal business, from which Zoetis derives approximately 70% of its total revenue; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls. The Proxy Statements also contained false and misleading statements regarding the Board's risk oversight and the Company's enterprise risk management program.

212. The misleading information contained in the Proxy Statements was material to Zoetis stockholders in determining whether to elect or reelect Defendants Bisaro, Broadhurst, D'Amelio, Hattersley, Khosla, Leatherberry, McCallister, Norden, Parent, Peck, Reed, Stetter, and Tilenius to the Board and to approve executive compensation.

- 64 -

213.    The material misstatements and omissions in the Proxy Statements damaged the Company.

214.    Plaintiff, on behalf of Zoetis, seeks relief for damages inflicted upon the Company based on the misleading Proxy Statements in connection with the improper election or reelection of Defendants Bisaro, Broadhurst, D'Amelio, Hattersley, Khosla, Leatherberry, McCallister, Norden, Parent, Peck, Reed, Stetter, and Tilenius to the Board and the approval of executive compensation.

## COUNT III
### Contribution Under Section 21D of the Exchange Act
### (Derivatively on Behalf of Zoetis Against the Individual Defendants)

215.    Plaintiff incorporates by reference and re-alleges each allegation set forth above as though fully set forth herein.

216.    The conduct of the Individual Defendants, as described herein, has exposed the Company to significant liability under the federal securities laws.

217.    Zoetis is named as a defendant in the Securities Class Action that alleges and asserts claims arising under the federal securities laws. The Company is alleged to be liable to private persons, entities, and/or classes by virtue of many of the same facts alleged herein. If Zoetis is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of all or some of the Individual Defendants as alleged herein, who have caused the Company to suffer substantial harm through their misconduct. The Company is entitled to contribution and indemnification from the Individual Defendants in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

218.    As officers and/or directors of Zoetis, the Individual Defendants had the power or ability to, and did, control or influence, either directly or indirectly, Zoetis's general affairs, including the content of its public statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated the federal securities laws.

219.    The Individual Defendants are liable under § 21D of the Exchange Act, which governs the application of any private right of action for contribution asserted pursuant to the federal securities laws.

220.    The Individual Defendants have damaged the Company and are liable to the Company for contribution.

## COUNT IV
### Breach of Fiduciary Duty
### (Derivatively on Behalf of Zoetis Against the Individual Defendants)

221.    Plaintiff incorporates by reference and re-alleges each allegation set forth above as though fully set forth herein.

222.    The Individual Defendants owed and owe fiduciary duties to Zoetis. By reason of their fiduciary relationships, the Individual Defendants specifically owed and owe Zoetis the highest obligation of good faith and loyalty in the administration of Zoetis's affairs. The Individual Defendants also had specific fiduciary duties as defined by the Company's corporate governance documents and principles that, had they been discharged in accordance with their obligations, would have prevented the misconduct and consequential harm to Zoetis alleged herein.

223.    The Individual Defendants ignored their obligations under state and federal law. The Individual Defendants failed to make a good faith effort to correct the problems or prevent their occurrence.

224.    The Individual Defendants each violated their fiduciary duties to Zoetis and its stockholders by, among other things, failing to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Zoetis' core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the safety and veterinarian acceptance of Zoetis' flagship Companion Animal products, Zoetis' response to the FDA's safety concerns regarding those products, and the intensifying competitive pressure facing Zoetis' Companion Animal business, from which Zoetis derives approximately 70% of its total revenue; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

225.    The Individual Defendants further breached their fiduciary duties to Zoetis by, *inter alia*, making or allowing the dissemination of materially false and misleading statements and material omissions in public statements and regulatory filings, including the Proxy Statements, the Company's conference calls with financial analysts and investors, and the Company's industry and investor conference presentations, regarding the very subjects they had failed to oversee.

226.    By committing the misconduct alleged herein, the Individual Defendants breached their duties of good faith and loyalty in the management and administration of Zoetis' affairs and the use and preservation of its assets.

227.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Zoetis has sustained significant damages, not only monetarily, but also to its corporate image and goodwill. Such damages include, among other things, the costs of

defending and resolving the pending Securities Class Action and the corporate assets wasted on share repurchases at artificially inflated prices.

228. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## COUNT V
### Aiding and Abetting Breach of Fiduciary Duty
### (Derivatively on Behalf of Zoetis Against the Individual Defendants)

229. Plaintiff incorporates by reference and re-alleges each allegation set forth above as though fully set forth herein.

230. Each of the Individual Defendants has acted and is acting with knowledge of or with reckless, or grossly negligent, disregard to the fact that the Individual Defendants are in breach of their duties to the Company and have participated in such breaches of duties.

231. In committing the wrongful acts, each of the Individual Defendants has pursued or joined in the pursuit of a common course of conduct. They have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to pursuing the wrongful conduct that gives rise to their primary liability, the Individual Defendants also aided and abetted, and/or assisted, each other in breaching their respective duties.

232. Because the actions described herein occurred under the Board's supervision and authority, each of the Individual Defendants played a direct, necessary, and substantial part in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

233. Each of the Individual Defendants aided and abetted each other and rendered substantial assistance in the wrongs complained of herein.

234. Plaintiff, on behalf of Zoetis, has no adequate remedy at law.

- 68 -

**COUNT VI**
**Unjust Enrichment**
**(Derivatively on Behalf of Zoetis Against the Individual Defendants)**

235.    Plaintiff incorporates by reference and re-alleges each allegation set forth above as though fully set forth herein.

236.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Zoetis, as a result of their compensation and director remuneration and the proceeds which they received as a result of their misstatements and material omissions, while breaching fiduciary duties owed to Zoetis.

237.    Further, the Insider Seller Defendants sold Zoetis common stock while in possession of material nonpublic information that artificially inflated the price of Zoetis common stock. As a result, the Insider Seller Defendants profited from their misconduct and were unjustly enriched through their exploitation of material and adverse inside information.

238.    Plaintiff, as a stockholder and representative of Zoetis, seeks on behalf of the Company an order of this Court ordering the Insider Seller Defendants to disgorge and furnish restitution to Zoetis of all profits, benefits, and other compensation obtained through their wrongful conduct and fiduciary breaches, and further ordering the Individual Defendants to disgorge all compensation received while in breach of their fiduciary duties.

239.    Plaintiff, on behalf of Zoetis, has no adequate remedy at law.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of Zoetis, demands judgment against the Individual Defendants as follows:

A.  Declaring that Plaintiff may maintain this action on behalf of Zoetis and that Plaintiff is an adequate representative of the Company;

B.  Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Zoetis;

C.  Declaring that the Individual Defendants violated Sections 10(b), 14(a), and 21D of the Exchange Act;

D.  Determining and awarding to Zoetis the damages sustained by it as a result of the Individual Defendants' violations, jointly and severally, together with pre-judgment and post-judgment interest;

E.  Directing the Individual Defendants to account for all damages sustained and profits made as a result of their wrongful conduct;

F.  Directing Zoetis and the Individual Defendants to reform and improve its compliance, internal control systems, and corporate governance practices and procedures to comply with applicable laws and protect the Company and its stockholders from a repeat of the damaging events described herein;

G.  Awarding to Zoetis restitution from the Individual Defendants, including disgorgement of all profits, benefits, and other compensation, including insider trading proceeds;

H.  Directing the Individual Defendants to contribute to or reimburse the Company for any liability or damages incurred in connection with the Securities Class Action;

I.  Awarding to Plaintiff the costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

J.  Granting such other and further relief as the Court deems just and proper.

## IX.    JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: June 19, 2026                                     By:    */s/Mark D. Smilow*
                                                                Mark D. Smilow

- 70 -

- 71 -

David C. Katz
**WEISS LAW**
305 Broadway, 7th Fl.
New York, NY 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010
Email: dkatz@weisslawllp.com
      msmilow@weisslawllp.com

Joshua M. Rubin
4 Brighton Rd., Ste. 204
Clifton, NJ 07014
Email: jrubin@weisslawllp.com

*Attorneys for Plaintiff*

## VERIFICATION

I, Barbara Wolfson, hereby verify that I have held stock in Zoetis Inc. ("Zoetis" or the "Company") since at least February 1, 2013. As such, I was a stockholder at the time of the transactions complained of in the Verified Stockholder Derivative Complaint ("Complaint"). I am ready, willing, and able to pursue this stockholder derivative action on behalf of the Company. I have reviewed the allegations in the Complaint, and as to those allegations of which I have personal knowledge, I know those allegations to be true, accurate and complete. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation, and for that reason I believe them to be true. Having received a copy of the foregoing Complaint, and having reviewed it with my counsel, I hereby authorize its filing.

Dated: June 18, 2026

*Barbara Wolfson*
Barbara Wolfson (Jun 18, 2026 09:08:35 EDT)

Barbara Wolfson